**CEH, INC., Plaintiff**

v.

**F/V SEAFARER (O.N. 675048), In Rem, Michael A. Doyle, Charles Niles, Roger Scott Smith, In Personam, Defendants.**

**Civ. A. No. 92–0389L.**

United States District Court, D. Rhode Island.

March 28, 1995.

942

James H. Reilly, III, Donald T. Maroney, and Mark McSally, Kelly, Kelleher, Reilly & Simpson, Providence, RI, for plaintiff.

Barbara S. Cohen, Goldenberg & Muri, Providence, RI and Leonard W. Langer, Thompson, McNaboe, Ashley & Bull, Portland, ME, for defendants.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court for decision following a bench trial. Plaintiff CEH, Inc. ("CEH") brought this action against the F/V SEAFARER ("SEAFARER"), In Rem, and Michael A. Doyle ("Doyle"), Charles Niles ("Niles"), and Roger Scott Smith ("Smith"), In Personam, for the alleged loss and destruction of lobster gear owned by plaintiff during the period May 23 through June 7, 1992. The SEAFARER is the vessel charged with destroying the gear and has been sued in rem pursuant to this Court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333. Defendant Doyle is the owner of the SEAFARER, and defendants Niles and Smith served as captains of the vessel at different times during the period in question, and are charged individually with negligence and intentional misconduct which caused the destruction of the gear.

## I. Facts

The facts in this case are a source of significant dispute. Since this is an admiralty case, plaintiff must prove its case and the facts that support it by a fair preponderance of the evidence. *1st Bank Southeast of Kenosha, Wis. v. M/V Kalidas*, 670 F.Supp.

1421 (E.D.Wis.1987); *Valentine v. U.S.*, 630 F.Supp. 1126 (S.D.Fla.1986). In addition, once fault is determined in an admiralty action, it is necessary for plaintiff to establish its entitlement to each item of damage claimed. *Complaint of Valley Towing Service*, 629 F.Supp. 139 (E.D.Mo.1985). With these basic principles in mind, this Court makes the following findings of fact.

CEH is the owner of the F/V COURTNEY ELIZABETH ("COURTNEY ELIZABETH"). The COURTNEY ELIZABETH is an off-shore lobstering vessel 90 feet in length. She was purchased new by plaintiff and has been engaged in off-shore lobstering since September, 1987, based in Point Judith, Rhode Island. The President of CEH is T. Brian Handrigan, and the Vice President is his son, Timothy Handrigan. The elder Handrigan has been in the fishing industry since 1961, and the younger has been a captain of fishing vessels since 1985.

During May and June of 1992, CEH owned approximately 4,200 lobster traps, of which 2,857 were set off shore in the Atlantic Ocean. The traps were set in an arrangement commonly referred to as a "lobster trawl." A lobster trawl consists of between 40 and 55 lobster traps, and it is set on the bottom of the ocean. Each end of the lobster trawl—a so-called "trawl end"—is marked with buoys, high fliers, and radar reflectors that float upon the ocean's surface so that a lobsterman can visually locate the trawls when he attempts to retrieve his catch.

A high flier is a device which floats on top of the water, and consists of ring floats, an aluminum pole, and a flag. A high flier is also marked with radar reflectors. Connected to the high flier and running to the bottom of the ocean is an "up-and-down line," made of ⅝″ poly-pro rope. That line is connected to the top of a blivet, a cement weight that rests on the ocean floor. Also attached to the blivet is a ground line. The ground line is made of ⅝″ poly-pro rope and runs along the bottom of the ocean to connect the traps. At the opposite end of the trawl, the ground line attaches to another blivet. This other blivet also has an up-and-down line attached to another high flier, which floats at

the surface, and marks the opposite end of the trawl above water.

In early May of 1992, plaintiff's vessel, the COURTNEY ELIZABETH, experienced a series of mechanical problems which required her to be docked for repairs. The testimony establishes that she was hauled on May 13, 1992. Before she was hauled, the COURTNEY ELIZABETH had made fifteen trips during 1992. The record keeping practices of CEH designates this trip of the COURTNEY ELIZABETH as Trip 15. The next trip made by the COURTNEY ELIZABETH commenced on June 7, 1992. However, after she left port on that day, she experienced further mechanical problems and returned for repairs. The voyage was formally commenced on June 10, 1992, and the COURTNEY ELIZABETH concluded this trip on June 12, 1992. This trip is known in CEH's records as Trip 17.

During the time that the COURTNEY ELIZABETH was laid up, her lobster gear remained on the ocean floor, and it was tended on one occasion by the F/V MONITOR ("MONITOR"). The trip of the MONITOR is recorded as Trip 16 in CEH's records. Trip 16 commenced on May 19, 1992, and concluded on May 23, 1992. During this time, the MONITOR was captained by Ted McCaffrey ("McCaffrey"). McCaffrey normally was the mate and alternate captain on board the COURTNEY ELIZABETH.

During Trip 16, McCaffrey hauled and reset 60 lobster trawls belonging to the COURTNEY ELIZABETH. The trawls were reset generally in the area known as Atlantis Canyon. The specific locations of these trawls were recorded in the log book for the COURTNEY ELIZABETH. The traps were reset in essentially two types of patterns: some were set in straight lines, and others were set along the contour of the ocean floor.

When the COURTNEY ELIZABETH returned to service on Trip 17 after its repairs, her crew discovered that 1,093 traps and related equipment were missing. From the time that Trip 16 was completed on May 23, 1992 until the time that Trip 17 was commenced on June 7, 1992, defendant SEAFARER made two trips. It is plaintiff's contention that its lobster gear was damaged or destroyed by the SEAFARER on one or both of these trips.

The evidence establishes that the following traps owned by plaintiff were set at the end of Trip 16 and were not recovered, either entirely or partially, on Trip 17: Trawl 33, consisting of 50 wooden pots, all of which were lost, its northeast end at Loran Coordinates 14218.5, 43245.5 and at a depth of 170 fathoms, its southwest end at 14225.0, 43245.5 and at a depth of 152 fathoms; Trawl 136, consisting of 50 wire pots, of which 27 pots were destroyed or damaged, its northeast end at Loran Coordinates 14225.5, 43251.5 and at a depth of 160 fathoms, its southwest end at 14321.0, 43249.5 and at a depth of 165 fathoms; Trawl 38, consisting of 50 wooden pots, of which 21 pots were damaged or destroyed, its north end at Loran Coordinates 14233.0, 43252.0 and at a depth of 173 fathoms, its south end at 14232.0, 43245.5 and at a depth of 182 fathoms; Trawl 43, consisting of 45 wooden A-frame pots, of which 22 traps were damaged or destroyed, its east end at Loran Coordinates 14248.0, 43253.0 and at a depth of 176 fathoms, its west end at 14253.0, 43253.0 and at a depth of 173 fathoms; Trawl 52, consisting of 45 wooden A-frame pots, all of which were lost, its east end at Loran Coordinates 14247.5, 43258.0 and at a depth of 154 fathoms, its west end at 14252.5, 43258.0 and at a depth of 154 fathoms; Trawl 122, consisting of 50 wire pots, all of which were lost, its east end at Loran Coordinates 14253.0, 43254.5 and at a depth of 165 fathoms, its west end at 14258.0, 43254.5 and at a depth of 170 fathoms; Trawl 60, consisting of 40 wooden, A-frame pots, 34 of which were lost, its southeast end at Loran Coordinates 14262.5, 43253.0 and at a depth of 186 fathoms, its northwest end at 14263.0, 43257.5 and at a depth of 172 fathoms; Trawl 10A, consisting of 50 wire traps, all of which were lost, its east end at Loran Coordinates 14267.5, 43263.0 and at a depth of 184 fathoms, its west end at 14275.5, 43263.5 and at a depth of 187 fathoms; Trawl 16, consisting of 50 wire pots, all of which were lost, its east end at Loran Coordinates 14268.0, 43265.0 and at a depth of 171 fathoms, its west end at

14273.5, 43265.0 and at a depth of 180 fathoms; Trawl 114, consisting of 50 wire traps, all of which were lost, its east end at 14275.0, 43265.0 and at a depth of 180 fathoms, its west end at 14281.0, 43265.5 and at a depth of 176 fathoms; Trawl 112, consisting of 50 wire pots, 22 of which were lost, its southeast end at Loran Coordinates 14283.0, 43264.0 and at a depth of 184 fathoms, its northwest end at 14288.0, 43267.2 and at a depth of 184 fathoms; Trawl 122, consisting of 50 wire pots, all of which were lost, its east end at Loran Coordinates 14253.0, 43254.5 and at a depth of 165 fathoms, its west end at 14258.0, 43254.5 and at a depth of 170 fathoms; Trawl 153, consisting of 50 wire pots, all of which were lost, its south end at Loran Coordinates 14278.5, 43292.5 and at a depth of 170 fathoms; its north end at 14277.5, 43298.0 and at a depth of 171 fathoms; Trawl 31, consisting of 50 wire pots, all of which were lost, its east end at Loran Coordinates 14299.0, 43286.0 and at a depth of 170 fathoms, its west end at 14306.5, 43286.0 and at a depth of 172 fathoms; Trawl 8, consisting of 50 wire traps, all of which were lost, its east end at Loran Coordinates 14353.5, 43282.2 and at a depth of 179 fathoms, its west end at 14361.0, 43282.2 and at a depth of 176 fathoms; and Trawl 111, consisting of 50 wire traps, all of which were lost, its east end at Loran Coordinates 14363.0, 43282.0 and at a depth of 176 fathoms, its west end at 14369.0, 43282.0 and at a depth of 186 fathoms.

Aside from the 671 traps mentioned above, plaintiff also lost 422 additional traps. However, plaintiff makes no claim for their loss since they were set in an area in which the SEAFARER did no dragging during the time in question. Plaintiff only seeks damages for the traps lost which were located near Atlantis Canyon where the SEAFARER was fishing during the period May 23 to June 7, 1992.

Plaintiff alleges that the SEAFARER destroyed the gear belonging to the COURTNEY ELIZABETH by "dragging" or "towing" through the trawls. Unlike the COURTNEY ELIZABETH, the SEAFARER is a raised focsle stern trawler, and she uses nets, rather than fixed traps, to catch fish. The SEAFARER is also based in Point Judith, RI. During the two trips about which plaintiff complains, the SEAFARER travelled from Point Judith to an area near Atlantis Canyon and fished for monkfish. Since monkfish live near the ocean floor, the SEAFARER would drag its nets close to the bottom. Also, since some fishermen believe that monkfish are attracted to lobster traps, the SEAFARER would, from time to time, intentionally drag its nets near fixed lobster traps. As a result, some of the tows performed by the SEAFARER—using nets that extend for a quarter mile or more behind the boat—encountered the fixed lobster gear belonging to the COURTNEY ELIZABETH.

Any captain of the SEAFARER enjoys a significant amount of discretion while fishing. Doyle, the owner of the SEAFARER, allows a captain to choose the area in which the vessel fishes, the length of the fishing trip, the type of fish sought to be caught, how close a tow comes to fixed lobster gear, and where the fish is to be sold. The discretion enjoyed by Smith and Niles when acting as captain aboard the SEAFARER is consistent with the discretion accorded to captains of other draggers of similar size and equipment.

During drags or tows, draggers often unintentionally bring up "ghost gear" in the nets. "Ghost gear" is damaged, destroyed, or abandoned lobster gear that is not attached to observable markers, that has fallen to the bottom of the ocean, and that is not retrieved by lobstermen. Ghost gear is obsolete fixed gear, and lobstermen have no interest in it. However, ghost gear is considered both a danger and an annoyance to the draggers, for it is not visible from the surface and can be easily caught in a dragger's nets, causing significant tears or defects. Fixed gear, on the other hand, is the opposite of ghost gear. It is visible from the surface because of its high fliers, and it is the gear used by lobstermen to trap lobsters. Because of the visible high fliers, fixed trawls can be readily avoided by draggers.

The incompatibility of the fishing gear used by the draggers and the lobstermen has led to tensions between the two groups. These tensions appear to run especially high during the times of the year when the species for which draggers and lobstermen fish

migrate to the same grounds. The evidence adduced at trial establishes that the area around Atlantis Canyon was fertile for both monkfish and lobsters at the time in question (late May, early June 1992), and tensions between the two groups were especially evident. Indeed, many of the lobstermen would keep watch over each others' gear, steaming over to watch draggers who towed in close proximity to fixed gear. In addition, some testimony suggested that there may have been some kind of understanding between the lobstermen and the draggers that the lobstermen would move their traps in shore by June 1. However, that point was not clearly established. In any event, it is clear from the evidence that the controversy between the lobstermen and the draggers was well known to the people in the commercial fishing industry.

The SEAFARER maintained no written policies as to the manner with which ghost gear or fixed gear should be dealt. Doyle testified that he expected the captains of the SEAFARER to use their discretion. Doyle believes, as most owners and captains do, that ghost gear need not be returned to its owner even if identifiable. Doyle also stated at trial that it was against the policy of the SEAFARER to tow through fixed gear at any time.

The two trips of the SEAFARER about which plaintiff complains occurred between May 23 and June 7, 1992. The first of the two trips occurred on May 23–24, 1992. During that time, Smith was captain. Members of the crew included Niles (mate), Russell Wilkinsen ("Wilkinsen"), Niles Piersall ("Piersall"), and John Lee ("Lee"). Each of these crew members had considerable previous experience. During this trip, the SEAFARER was fishing for monkfish in an area east of Atlantis Canyon, and either inside 135 fathoms or outside 215 fathoms. According to his testimony at trial, Smith chose this course out of respect for the fixed gear that the COURTNEY ELIZABETH and other lobstermen had laid on the bottom. While dragging for monkfish, Smith observed the

high fliers of fixed gear belonging to the COURTNEY ELIZABETH, but he never allowed the SEAFARER to come closer than one-quarter mile to any of that gear.

While the SEAFARER was dragging on May 24, she was observed by Capt. William Bennett ("Bennett") aboard the F/V HEDY BRENNA ("HEDY BRENNA"). Bennett saw the SEAFARER in a position close to lobster Trawls 33, 38, and 136 of the COURTNEY ELIZABETH. Bennett was concerned that the towing of the SEAFARER would either destroy the gear of the COURTNEY ELIZABETH or cause gear conflicts.[1] Bennett recorded the trips of the SEAFARER on videotape, and he recorded a conversation that he had with Capt. Smith of the SEAFARER as she dragged for monkfish. After this conversation, Bennett called his wife on shore and advised her to tell Timothy Handrigan that his lobster trawls were in danger. In response, on May 25, 1995, Handrigan called Niles and expressed his concern. Handrigan advised Niles that the COURTNEY ELIZABETH was out of the water for repairs and that her gear would not be tended for a short time. When Handrigan offered to advise Niles of the location of the gear so that the SEAFARER might avoid the untended gear on subsequent trips, Niles responded that he did not need that information.

The evidence produced at trial failed to prove that the SEAFARER ever caught any of the fixed gear belonging to the COURTNEY ELIZABETH in her nets on its trip during May 23–24, 1992. Any gear that was caught in the nets of the SEAFARER during this trip was ghost gear—the fractured, malfunctioning, or disintegrated remains of trawls left on the ocean floor. Any ghost gear caught in the nets was discarded at "hang points"[2] or into deep water off the continental shelf. Smith never brought any fixed or functioning gear onto the deck of the SEAFARER. Specifically, Trawls 33, 136 and 38 of the COURTNEY ELIZABETH, set on the ocean floor in the general area

---

1. Gear conflicts occur when the fixed gear from one trawl becomes entangled with the gear from another trawl.

2. Hang points are locations known to and avoided by draggers, as they contain items on which nets get caught and torn.

where the SEAFARER made 12 drags on May 23 and 24, were not injured by any of that activity.

The second trip of the SEAFARER took place from May 28 through June 7, 1992. During this trip, the SEAFARER was captained by Niles. The mate was John McKay ("McKay"), and deckhands included Piersall, Phien Hoang ("Hoang") and Richard Baker ("Baker"). McKay, Hoang and Piersall were experienced fishermen who had worked on the SEAFARER many times. Baker, the nephew of Captain Niles, was less experienced than the other deckhands and was normally a lobsterman, but he was given work on the vessel because Niles knew that he needed to earn money. Smith did not accompany the SEAFARER on this trip.

■ On May 29, 1992, Captain Robert Buffinton ("Buffinton") of the F/V EDNA MAE ("EDNA MAE") observed the SEAFARER in the area of the fixed gear of the COURTNEY ELIZABETH. Buffinton steamed over to watch the SEAFARER drag. Buffinton knew that the COURTNEY ELIZABETH had been hauled for repairs. As he approached, he observed that the SEAFARER had approximately twenty (20) lobster traps on her deck, though he could not identify the owner of these traps. Buffinton placed a call to Niles to inquire about the gear on his deck. Niles said that the traps were owned by Timothy Handrigan and John Eddy and that he would return the traps to Point Judith.

The evidence offered at trial was insufficient to establish which, if any, of the 20 traps on the deck of the SEAFARER on May 29 belonged to plaintiff. From his point of view, Buffinton was unable to make such a determination, and Niles' statement is both too imprecise and too undependable to serve as a basis upon which to apportion damages.[3] Neither was any evidence offered to establish how many of the traps on the deck of the SEAFARER were ghost gear and how many were workable traps. Buffinton's testimony is insufficient to do so. Moreover, Buffinton

never saw the SEAFARER tow through any fixed gear belonging to plaintiff. Absent direct or circumstantial evidence of damage to particular traps, plaintiff has not met its burden and cannot recover for those trap losses. *See Salaky v. Atlas Barge No. 3*, 208 F.2d 174 (2d Cir.1953); *O'Donnell Transp. Co. v. M/V Maryland Trader*, 228 F.Supp. 903 (S.D.N.Y.1963).

During the following days, the SEAFARER continued to drag for monkfish near the gear owned by plaintiff. According to the wholly credible testimony of Richard Baker, the drags of the SEAFARER brought over 200 lobster traps on her deck over the next few days. Approximately seventy percent (70%) of these traps—or 140 of 200—were workable traps; the remaining sixty were ghost gear. Baker also observed that approximately 115 of the 140 functioning traps brought on the deck of the SEAFARER belonged to plaintiff. Approximately thirty percent (30%) of these traps still had bait in them.

■ The time during which the traps of the COURTNEY ELIZABETH were brought on board the deck of the SEAFARER can be determined by the testimony of Baker and McKay. McKay stated, sometime on or about June 3–4 upon observing a Coast Guard plane fly overhead, that the crew of the SEAFARER had been well-served by its decision to dump overboard the large number of traps that they had on deck. This comment, in conjunction with Baker's testimony that most of the gear had been brought on deck during the first few days when he had worked all of the drags, establishes that plaintiff's gear was brought on the deck of the COURTNEY ELIZABETH sometime from May 30 to June 2, 1992.[4]

McKay's comment regarding the fly-over of the Coast Guard plane is also important for another reason: if the Coast Guard plane had seen the gear on deck, the SEAFARER would have had an eye witness to its misconduct. Specifically, McKay's comment sug-

---

3. Niles may have been protecting himself from Buffinton, since it may have been gear belonging to the EDNA MAE that was on the deck of the SEAFARER at the time.

4. The front end of this time period has been established as May 30, as the 200 traps came on board after the SEAFARER was observed by Capt. Robert Buffinton of the EDNA MAE.

gests misconduct on the part of the crew of the SEAFARER, since it was not unusual for a dragger to have some workable gear on its deck. For McKay to make such a comment, therefore, a disproportionately large amount of gear must have come up in the SEAFARER's nets. McKay's later qualification—that this comment was meant in jest—is wholly disingenuous. It is obvious then that the SEAFARER, under Niles' command, towed through fixed gear belonging to plaintiff.

The precise trawls through which the SEAFARER towed can be determined by comparing the log books of the COURTNEY ELIZABETH to the log books of the SEAFARER and by scrutinizing the entries in light of oral testimony.[5] The evidence, viewed collectively, establishes that the SEAFARER towed through Trawls 16, 60, and 114 of plaintiff on May 31 and June 1. The crew of the SEAFARER had brought most of the traps contained in these trawls on deck by the end of the day on June 1.

The primary evidence of destruction of these trawls comes from Baker's oral testimony concerning the circumstances under which the traps were brought on board the SEAFARER. His testimony establishes that he participated in every drag during the first few days of the trip when the traps were brought on board, that the traps belonging to plaintiff that were brought on board were both wooden and wire, and that approximately 115 traps belonging to plaintiff were brought on board and later dumped. Baker's estimate that 115 of plaintiff's traps were involved was an educated guess. Baker's testimony and other evidence in the case allows the Court to determine that the actual number of plaintiff's traps destroyed by the SEAFARER from May 30 to June 2 was 134.

The log books of the COURTNEY ELIZABETH and the SEAFARER reveal that the SEAFARER towed through Trawl 114 on May 31, 1992. The log book of the SEAFARER shows that the last two drags that day followed a course that bisected the groundline of Trawl 114. The penultimate drag of the SEAFARER started at Loran Coordinates 14285, 43267 and proceeded predominantly to the east, and slightly to the north, to 14230, 43256. The final drag of the SEAFARER started at Loran Coordinates 14222, 43258 and moved mostly to the west and slightly to the south, to Loran Coordinates 14282, 43267. Trawl 114 was laid with its east end at 14275.0, 43265.0 and at a depth of 180 fathoms, its west end at 14281.0, 43265.5 and at a depth of 176 fathoms. Lines drawn between the starting and endpoints of the tows of the SEAFARER either intersect, and, in the case of the last drag, closely approach, a line drawn between the starting and ending points of Trawl 114. Viewed in combination with Baker's oral testimony, this evidence proves that the SEAFARER destroyed Trawl 114. Moreover, the drags during which the SEAFARER towed through Trawl 114 would have occurred in the dark, a time during which she would not have been easily observed and when illicit activity would have been more easily performed.

The SEAFARER also destroyed two Trawls, numbered 16 and 60, on June 1. The last three tows of the SEAFARER on June 1 caused the damage to these trawls. These three tows proceeded in the following manner: the fourth tow of the day from Loran Coordinates 14222, 43257 southwest to 14280, 43266; the fifth tow of the day from Loran Coordinates 14280, 43267 northeast to 14224, 43258; and the final tow of the day from Loran Coordinates 14233, 43249 southwest to 14286, 43257. Trawl 60 was placed with its southeast end at 14262.5, 43253.0 and its northwest end at 14263.0, 43257.5. Trawl 16 was placed with its east end at Loran Coordinates 14268.0, 43265.0 and its west end at 14273.5, 43265.0. The fourth and fifth tows of the SEAFARER bisected Trawl 16. The last trip intersected Trawl 60. The charted path of the SEAFARER, in combination with the oral testimony, proves that the SEAFARER destroyed Trawls 16 and 60 during its last 3 tows on June 1.

None of the lobster traps from Trawls 16, 60, and 114 that came aboard the SEAFAR-

5. In making these factual determinations, the Court has not relied on the testimony of expert David Kolator, called by plaintiff. His testimony, and the computer program upon which Kolator relied, are of dubious value in determining which trawls were destroyed.

ER were ever returned to plaintiff. They all were thrown over the side of the SEAFAR-ER, and, through that gesture, were converted to ghost gear. It was Captain Niles himself who ordered plaintiff's traps to be discarded. Although it was customary for draggers to return workable fixed gear to port when they were caught in their nets, Niles did no such thing. Indeed, he told the deckhands to dispose of all of the traps and later made jokes about it. The deckhands complied. In so doing, Niles showed a callous disregard for the property rights of plaintiff and other lobstermen.

The final fact that proves that Niles brought plaintiff's workable traps on the deck was the number of lobsters caught by the SEAFARER on its trip from May 27 to June 7, 1992. Testimony established that during this trip, the vessel caught between 1,100 and 1,300 pounds of lobster, by far the most lobster the SEAFARER had ever caught when fishing for monkfish. The inference is compelling that not only did Niles destroy plaintiff's gear but also he appropriated plaintiff's catch for his own enrichment.

Aside from the gear brought onto its deck, the SEAFARER probably also destroyed a number of other trawls owned by plaintiff. These other trawls were caught in the nets and on the doors of the SEAFARER during drags that took place from June 1 though June 7. Instead of performing the complicated task of untangling their nets from plaintiff's traps, or even the more tedious task of storing all those traps aboard the vessel to return them to their owners, Niles simply ordered the traps to be cut loose. The traps fell to the ocean floor and were subsequently unrecoverable.

The cause for the destruction of the remainder of plaintiff's gear (over and above the 134 traps and associated equipment) has not been proven by either circumstantial or direct evidence. While Baker's testimony establishes that the crew of the SEAFARER cut the ground lines connected to lobster trawls other than Trawls 16, 60, and 114 on at least ten occasions, his testimony failed to establish whether those trawls belonged to plaintiff or whether those ground lines were attached to functional trawls or to ghost gear. While it is probable that at least some of plaintiff's gear was lost in this fashion, it is impossible on this record to quantify it. It is also possible that the gear could have been destroyed by other forces.

Indeed, the evidence at trial did show that all lobstermen lost a disproportionate amount of fixed gear, as much as 25% of their total gear, during the first half of 1992. Whether the traps were destroyed due to difficult weather conditions or as the result of an undeclared war that raged between the draggers and the lobstermen is unclear.

Moreover, aside from the SEAFARER, there were at least eleven other draggers sighted in the area of plaintiff's gear during the time about which plaintiff complains. These other vessels included the F/V KATE & SHAWN, the F/V POINT JUDITH, the F/V MORNING STAR, the F/V ATLANTIC QUEEN, the F/V JASON & DANIELLE, the F/V ST. JUDE, the F/V GLACIER BAY, the F/V LUKE & SARA, the F/V RHONDA DENISE, the F/V AGGRESSOR, and the F/V YANKEE LADY. Timothy Handrigan himself observed Captain Lewis aboard the F/V DEBBIE SUE pulling up trawl 49 of the COURTNEY ELIZABETH on June 10, 1992. Since these draggers all fished in the area of Atlantis Canyon, it is impossible to blame the loss of all of plaintiff's gear on the defendants. In short, plaintiff has failed to sustain its burden of proving that defendants were responsible for the loss of plaintiff's gear over and above the 134 traps and connected gear previously mentioned. *See Salaky, supra,* 208 F.2d at 174; *M/V Maryland Trader, supra,* 228 F.Supp. at 903.

## II. Analysis

Plaintiffs have brought this suit pursuant to this Court's maritime jurisdiction. *See* 28 U.S.C. § 1333. All of the facts surrounding the claim bear a significant relationship to a traditional maritime activity. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Since no statutory claim has been brought, this case will be decided under the principles of general maritime law. *See Kermarec v. Compagnie Generale Transatlantique,* 358

U.S. 625, 628, 79 S.Ct. 406, 408–09, 3 L.Ed.2d 550 (1959); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 409–11, 74 S.Ct. 202, 204–06, 98 L.Ed. 143 (1953); *The Seven Brothers,* 170 F. 126 (D.R.I.1909).

Plaintiffs' amended complaint seeks recovery on two theories. Count I is a negligence claim that seeks compensatory damages for the cost of the damaged and lost lobster gear. In Count II plaintiff alleges that the defendants' destroyed the lobster gear by intentional, willful, malicious and/or grossly reckless misconduct. Count II seeks punitive damages pursuant to general maritime law. These two Counts, and the damages that are available under each, will be discussed seriatim.

## A. Count I: The Negligence Theory

■ In Count I plaintiff avers that defendants negligently damaged lobster traps and associated gear owned by plaintiff during drags occurring from May 23 through June 7, 1992. Plaintiff claims that the drags that bisected its lobster gear deprived plaintiff of its property rights [6] and thereby violated federal maritime law. Plaintiff seeks compensation for all components of the lost gear.

### 1. Liability

Specifically, plaintiff argues that defendants' drags through plaintiff's fixed gear constituted a breach of the duty of reasonable care owed to plaintiff as a fellow fisherman. Plaintiff asserts that the duty of care owed to it was the duty to maintain a proper lookout. Had a proper lookout been maintained, defendants could have taken reasonable steps to navigate clear of plaintiff's fixed gear.

■ The District of Rhode Island recognizes that the right of navigation is superior to the right of fishing. In *Rogers v. Tallman & Mack Fish & Trap Co.,* 234 F.Supp. 358 (D.R.I.1964), the court considered the question of liability when a navigator of a pleasure motor cruiser struck a floating fish trap in Narragansett Bay. Plaintiff, the naviga-

tor of the damaged motor cruiser, brought suit to recover monetary damages, and the owner of the fishing traps counterclaimed for damages done to the fishing traps. The court found for the fisherman, noting that

> [w]hile it is true, as the [plaintiffs] contend, that the right of navigation ... is paramount to that of fishing, a navigator may not, by his own negligence, unnecessarily force those two rights to conflict and then claim the benefit of the paramount right.

*Id.* at 361. The court held that the navigator had been negligent for failing to maintain a proper lookout. Had a lookout been properly maintained, the navigator would have been aware of the fishing gear and could have used reasonable care to avoid it.

■ As between fishermen, however, there is no priority of rights to fish in a particular area; each fisherman owes the other a duty of reasonable care. The style of fishing employed by a dragger which relies substantially on navigation does not, as a matter of course, make the dragger's rights to fish a particular area superior to that of a lobsterman who fishes with fixed traps. Rather, both vessels have an equivalent right to fish a particular area, and both vessels owe each other a duty of care, a duty to obey the "rules of the road." *See* Warren J. Marwedel, *Admiralty Jurisdiction and Recreational Craft Personal Injury Issues,* 68 Tul. L.Rev. 423, 457 (1994). The "rules of the road" are founded on principles of cooperation. Just as the dragger must take reasonable steps to avoid the clearly marked fixed gear of the lobsterman, so too must the lobsterman clearly mark his gear in order to signal the dragger of its presence.

■ The SEAFARER cannot claim that it enjoys a superior right because she "navigated" through the traps belonging to plaintiff. Unlike the hypothetical vessel for which the paramount right to navigation was designed, the SEAFARER knew of the plaintiff's traps and *could have taken steps to avoid them.*

---

**6.** Plaintiff does not properly have a claim for lost profits before this Court. The exhibits regarding lost profits were voluntarily withdrawn at trial, and the Court granted a motion to strike all testimony relating to lost profits. Plaintiff's at-

tempt to reassert the claim in the post-trial memorandum (as evidenced by a comparison of tax forms) is insufficient, both as a matter of procedure and as a matter of fact.

Even if the crew of the SEAFARER did not have direct knowledge of the position of plaintiff's trawls, they could have acquired such knowledge through proper use of a lookout or through a simple phone call to the Handrigans. In any event, the right to navigate cannot be claimed as paramount when the navigator intentionally, recklessly or negligently puts in conflict the right to fish and the right to navigate. *Rogers,* 234 F.Supp. at 361. Defendant Niles clearly forced those rights to conflict in this case.

■ There is no doubt that Niles, at the very least, was grossly negligent in destroying Trawls 16, 60 and 114 that belonged to plaintiff. The evidence was clear that these trawls were marked with high fliers to signal their presence and that, even if the high fliers had been lost, Niles was on notice as to the position of the traps from sightings during the first trip of the SEAFARER, when he served as mate. Moreover, Niles had and rejected the opportunity to easily obtain information concerning the position of the traps from Timothy Handrigan. When Handrigan called Niles on May 25, 1992, he offered to supply Niles with information concerning the location of the COURTNEY ELIZABETH's fishing gear, but Niles refused to receive such information.

■ It is also perfectly clear that Niles' breach of the duty of care actually and proximately caused injury to plaintiff's property. The drags of the SEAFARER that intersected the trawls of plaintiff did one of two things: first, the nets dragged the trawls to a different position destroying the high fliers so that they were impossible to find, or second, the drags pulled the traps up into its nets and later those traps were destroyed by dumping them overboard. Niles ordered those tows and the concomitant destruction of the traps. Therefore, he is liable, and his misconduct makes the vessel and his employer, Doyle, also liable. Defendant Smith is absolved of liability in this case—there is no proof that he did anything wrong.

## 2. Compensatory Damages

■ Plaintiff, having proved that Niles, Doyle and the vessel are liable for the destruction of Trawls 16, 60, and 114, is entitled to compensatory damages. The proper measure of damages in this case is the replacement cost of the trawls, including both the traps as well as related gear, less depreciation. Straight line depreciation is appropriate in this case. *Portland Pipe Line Corp. v. M/V BARCOLA,* 1982 A.M.C. 2725 (D.Me. 1982).

To establish the value of the trawls, plaintiff called two experts: David Kolator, to testify as to the value of particular trawls, and William Horan, to testify as to the calculation of depreciation. Kolator used sales receipts and previous calculations that he performed in a lost gear compensation case, to support his testimony as to replacement cost. During Kolator's testimony, the Court disallowed certain portions of the expert's testimony that inaccurately calculated the replacement costs. For example, the Court disallowed maintenance costs to be included in the average cost of a trap, whether wood or wire. However, the testimony of Kolator and Horan is not without value. The admissible portion of their testimony is useful in determining the amount of damages payable to plaintiff.

As a preliminary matter, the Court notes that the following items need to be replaced in a lobster trawl: wooden or wire traps; ground line; snoods; bridles; trawl ends, consisting of a high flier, a poly-form buoy, reflective tape and paint, shackles, a flag, a blivet, an up-and-down line and cement line weights; and the labor involved in putting a trawl together. The Court accepts the following replacement values in 1992 as accurate: wire traps had a replacement value of $47.84 per trap, including $1.15 cost of identification tags and bait tags; wooden traps had a replacement cost of $35.86 per trap, including the same $1.15 cost as above; ⅝″ poly-pro rope, used for the ground lines, the up-and-down lines, and the bridles, had a replacement value of $0.61 per fathom; ½″ poly-pro rope, used for snoods, had a replacement cost of $0.39 per fathom; trawl ends had a replacement value of $242.43, including a $45.00 cost for each high flier. Finally, the labor to assemble the traps into a trawl is calculated at $400 for each 50 trap trawl. Finally, the Court accepts the following facts, each of

which is relevant to trap construction: that there are 18 fathoms of ⅝" poly-pro rope between each trap and between the final trap and each blivet; that there are 2 fathoms of ½" poly-pro rope used for each snood; that there are 1.5 fathoms of ⅝" poly-pro rope for each bridle; and that there are two ends to each lobster trawl.

### a. Trawl 16

Trawl 16 was entirely destroyed by the actions of defendants on June 1, 1992. Trawl 16 consisted of 50 wire pots as well as the standard accompanying materials, including ground line, snoods, bridles, and trawl ends. The value of each of the components is as follows: 50 wire traps at a replacement cost of $47.84 each, totaling $2392.00; 918 fathoms of ⅝" poly-pro rope as ground line at $0.61 per fathom, totaling $559.98; 100 fathoms of ½" poly-pro rope for snoods at a cost of $0.39 per fathom, totaling $39.00; 75 fathoms of ⅝" poly-pro rope for bridles at a cost of $0.61 per fathom, totaling $45.75; two trawl ends at a cost of $242.43 per trawl end, totaling $484.86; and labor costs of $400. Adding the values of all the components of Trawl 16 results in a pre-depreciation total value of $3,921.59.

### b. Trawl 60

Trawl 60 was partially destroyed by the acts of the defendant on May 31, 1992. Trawl 60 originally consisted of 50 wooden A-frame traps, but only one end, consisting of some 34 traps, was destroyed by the SEA-FARER. The Court finds that the value of each component of the lost portion of Trawl 60 includes: 34 wooden A-frame traps, at a replacement cost of $35.86 each, totaling $1,219.24; 621 fathoms of ⅝" poly-pro rope as ground line at $0.61 per fathom, totaling $378.81; 68 fathoms of ½" poly-pro rope for snoods at a cost of $0.39 per fathom, totaling $26.52; 51 fathoms of ⅝" poly-pro rope for bridles at a cost of $0.61 per fathom, totaling $31.11; one trawl end at a cost of $242.43; and labor costs of $302.22. Adding the values of all the components of Trawl 16 results in a pre-depreciation total value of $2,200.33.

### c. Trawl 114

Trawl 114 was entirely destroyed by the acts of the defendants on May 31, 1992. Trawl 114 consisted of 50 wire pots and related materials, including ground line, snoods, bridles, and trawl ends. The value of each of the components is as follows: 50 wire traps at a replacement cost of $47.84 each, totaling $2392.00; 918 fathoms of ⅝" poly-pro rope as ground line at $0.61 per fathom, totaling $559.98; 100 fathoms of ½" poly-pro rope for snoods at a cost of $0.39 per fathom, totaling $39.00; 75 fathoms of ⅝" poly-pro rope for bridles at a cost of $0.61 per fathom, totaling $45.75; two trawl ends at a cost of $242.43 per trawl end, totaling $484.86; and labor costs of $400. Adding the values of all the components of Trawl 114 results in a pre-depreciation total value of $3,921.59.

### d. Depreciation

Calculation of the depreciation applicable to each of the trawls lost was performed by plaintiff's expert witness William Horan. Horan used the straight line method to calculate depreciation for each of the trawls. The Court accepts the technique used by Horan as an accurate assessment of the depreciation for the trawls. Further, the Court finds that the following facts are true concerning depreciation of each of the lost trawls: that the useful life of wire traps is 96 months, or 8 years; that the useful life for wooden traps is 60 months, or 5 years; that the useful life for ½" poly-pro rope used for snoods and the useful life of ⅝" poly-pro rope used as groundline or for bridles is 48 months; that the useful life for ⅝" poly-pro rope used for up-and-down lines on trawl ends is 24 months; and that the useful life for the remainder of the equipment that comprises the trawl ends is 24 months. These assumptions must be applied to Trawls 16, 60 and 114 to calculate the amount of depreciation.

### 1. Depreciation of Trawl 16

The Court finds that plaintiff proved by a preponderance of the evidence that Trawl 16 was purchased from Gary Thompson and that the date of the purchase was March 30, 1989. When Trawl 16 was destroyed on June 1, 1992, it had been in service for 38

months of a total of 96 possible months. The depreciation factor to be applied to both the traps and the value of the labor to assemble the traps is 38 divided by 96, or 0.396.[7] The pre-depreciation value of the traps and labor of Trawl 16 was $2,792. Reducing this amount by the depreciation factor results in an amount depreciated of $1,105.17 and a post-depreciation value of $1,686.83.

The depreciation factor that is applied to each of the remaining items in Trawl 16 is 0.5. This factor was offered by Horan, and the Court accepts it as an accurate assessment of the average condition of plaintiff's gear at the time that it was destroyed by the defendants. The depreciation factor must be applied to the remaining items in the trawl, including the two varieties of poly-pro rope and the components of the trawl ends. The value of these remaining items in Trawl 16 is $1,129.59. Applying the depreciation factor of 0.5 leads to an amount depreciated of $564.80 and a post-depreciation value of $564.79.

Adding the depreciated values of both the traps and labor to the depreciated value of the remaining components of Trawl 16 results in a compensable value of $2,251.62.

## 2. Depreciation of Trawl 60

Plaintiff proved by a preponderance of the evidence that the lost portion of Trawl 60 was purchased from M & L Trap and that the 34 traps lost from Trawl 60 were wooden A-frame traps. Plaintiffs also proved that this trawl began service on June 30, 1991.

By the time that this trawl was destroyed on June 1, 1992, the trap had been in service for 11 of a possible 60 months of life. The depreciation factor to be applied to the labor and the traps in Trawl 60 is 11 divided by 60, or 0.183. The value of the labor and the traps lost in Trawl 60 is $1,521.46. Applying the depreciation factor to this amount yields a depreciated amount of $278.93 and a post-depreciation value of $1,242.53.

The remaining items in Trawl 60, including the two brands of rope and the components of the trawl end, will be depreciated using a factor of 0.5. As noted in the analysis of depreciation for Trawl 16, the Court accepts as accurate the facts that underlie the calculation of the 0.5 depreciation value. The value of the items remaining in Trawl 60 is $981.09. Applying the depreciation factor results in an amount depreciated of $490.55, and a post-depreciation value of $490.54.

Adding the depreciated values of both the traps and labor to the depreciated value of the remaining components of Trawl 60 results in a compensable value of $1,733.07.

## 3. Depreciation of Trawl 114

The Court finds that plaintiff proved by a preponderance of the evidence that Trawl 114 was purchased from M & L Trap and that the date that Trawl 114 began service was September 30, 1990. When Trawl 114 was destroyed on June 1, 1992, it had been in service for 20 months of 96 possible months. The depreciation factor to be applied to both the traps and the value of the labor to assemble the traps is 20 divided by 96, or 0.208. The pre-depreciation value of the traps and labor of Trawl 114 was $2,792. Reducing this amount by the depreciation factor results in an amount depreciated of $581.67 and a post-depreciation value of $2,210.33.

The depreciation factor that is applied to each of the remaining items in Trawl 114 is 0.5. This depreciation factor must be applied to the two varieties of poly-pro rope and the components of the trawl end. The value of these remaining items in Trawl 114 is $1,129.59. Applying the depreciation factor of 0.5 leads to a depreciated amount of $564.80 and a post-depreciation value of $564.79.

Adding the depreciated values of both the traps and labor to the depreciated value of the remaining components of Trawl 114 results in a compensable value of $2,775.12.

---

**7.** To calculate the amount depreciated and the post-depreciation value of each trawl, the court did not multiply the value of the trap by the depreciation coefficient rounded to the nearest thousandths, as written above. Rather, the court has used the unrounded, exact fractional calculation. The rounded figure is listed for convenience. The same procedure will follow for Trawls 60 and 114.

### e. Total

Trawls 16, 60 and 114 contained a total of 134 traps, all of which were destroyed by the defendants and they must make plaintiff whole for its losses. After depreciation, the compensation for Trawl 16 is $2,251.62, Trawl 60 $1,733.07, and Trawl 114 $2,775.12. The total amount of compensatory damages owed to plaintiff is $6,759.81.

■ Interest on these damages shall be assessed at a rate of 6% per annum, commencing from the date that the cause of action accrued, June 1, 1992 to the date of judgment. The award of prejudgment interest is clearly within the Court's discretion in admiralty cases. *See, e.g., Masters v. Transworld Drilling Co.*, 688 F.2d 1013 (5th Cir. 1982). This Court is not bound by the interest rate (12%) contained in the Rhode Island state statute, *see Cargill, Inc. v. Taylor Towing Serv., Inc.*, 642 F.2d 239, 242 (8th Cir. 1981). This Court has consistently applied an interest rate of 9% in admiralty cases of all kinds since 1986. However, since the rate is applied to compensate plaintiff for the loss of use of its money during the time in question, 6% will be used because it is a rough approximation of the prevailing average rate from 1992 to the present.

### B. Count II: Punitive Damages

On March 10, 1994, this Court held in *CEH, Inc. v. F/V Seafarer*, 153 F.R.D. 491 (D.R.I.1994), that plaintiff could assert a claim for punitive damages under the principles of maritime law in this case. Now, after trial, the Court must rule on the question of whether plaintiff has proven that Niles' conduct can be punished through the imposition of punitive damages.

■ The First Circuit has explicitly held that "punitive damages may be awarded in maritime actions where defendant's actions were intentional, deliberate or so wanton and reckless as to demonstrate a conscious disregard of the rights of others." *Muratore v. M/S Scotia Prince*, 845 F.2d 347, 354 (1st Cir.1988) (*citing The Amiable Nancy*, 16 U.S. (3 Wheat.) 546, 4 L.Ed. 456 (1818); *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.*, 767 F.2d 1379, 1385 (9th Cir.1985); *Complaint of Merry Shipping, Inc.* 650 F.2d 622, 624–25 & n. 9 (5th Cir.1981), *rehearing denied sub nom, Dyer v. Merry Shipping Co., Inc.*, 659 F.2d 1079 (5th Cir.1981); *In re Marine Sulphur Queen*, 460 F.2d 89, 105 (2d Cir.1972), *cert. denied, sub nom U.S. Fire Insurance Co. v. Marine Sulphur Transport Corp.*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972); *Robinson v. Pocahontas, Inc.*, 477 F.2d 1048, 1051–52 (1st Cir.1973); *Pino v. Protection Maritime Ins. Co., Ltd.*, 490 F.Supp. 277, 281 (D.Mass.1980)). In addition, "[t]he purpose served for awarding exemplary damages to a fully compensated plaintiff is to punish defendant and to deter others from engaging in like manner." *Muratore*, 845 F.2d at 347. This Court has long recognized that punitive damages are available in admiralty cases for willful and malicious actions. *The Seven Brothers*, 170 F. 126 (D.R.I.1909).

### 1. Captain Niles

■ Plaintiff has clearly proved that Niles was at fault for destroying its Trawls 16, 60 and 114. The evidence establishes that Niles acted in reckless disregard for the property rights of plaintiff by plowing through plaintiff's fixed gear. In addition, the evidence establishes that Niles acted intentionally and maliciously in ordering his crew to cut trawl lines that became entangled on the doors and nets of the SEAFARER and in dumping overboard the usable traps that came up in the nets of the SEAFARER.

Niles' malice is readily apparent when the facts of the case are viewed in their entirety. Before the trip, Niles already had demonstrated ill will toward the Handrigans for two reasons. First, Niles and the Handrigans had had a dispute over a generator that caused some bad blood between them. Second, Niles and the Handrigans were on opposite sides of an ongoing battle that raged between the lobstermen and the draggers over the rights to fish in the area near Atlantis Canyon.

The manner in which Niles fished from May 27 through June 7 also proves that he acted with malice. Niles knew that the COURTNEY ELIZABETH was laid up and unable to move or tend to her gear. In spite

of the COURTNEY ELIZABETH's incapacity and with miles of fertile ocean to fish, Niles brought the SEAFARER in close proximity to fixed gear belonging to plaintiff and at one point dragged a high flier behind it.[8] Niles also brought up at least 115 workable traps belonging to the COURTNEY ELIZABETH on its trip. Afterwards, Niles ordered that all of the workable traps be dumped overboard, instead of taking the time to return them to plaintiff. Later in the trip, Niles issued an order that the crew should cut all ground lines caught on the doors and in the nets of the SEAFARER. This order was given as Niles towed in and around the area in which plaintiff's fixed gear was located.

Niles' comments both during and after the trip also demonstrate his malice. For example, upon bringing one of the plaintiff's trawls on deck, he stated to Baker that the trawl should have been moved in shore. Later, upon observing the quantity of gear that he had brought on deck, he joked that he should sell the gear back to plaintiff. And finally, when Niles returned to shore and found that the Handrigans were angry enough to sue, he called Baker to ask him to revise his memory of the trip to comport with a version of facts that would acquit Niles of liability. Baker declined. Niles' testimonial attempt to explain this call to Baker is, to say the least, foolish, circuitous, and illogical. He said that he had called Baker to get his phone number.

■ An award of punitive damages is within the sound discretion of the trial court. *Muratore*, 845 F.2d at 347, 354 (1st Cir.1988). In determining the amount of the award, both the financial status of the defendant as well as the misconduct in which he engaged must be considered. *North Atlantic Fishing, Inc. v. Geremia*, 153 B.R. 607 (D.R.I. 1993). The evidence adduced at trial proves that Niles' net worth is $18,250. His assets include $500 in cash, $165,000 in real estate, $3,000 in personal property, and $2,500 in life insurance, totaling $171,000. His liabilities amount to $152,750. His income was not introduced into evidence.

Thus, in light of the testimonial and documentary evidence concerning both the financial status and the conduct of Niles this Court assesses an award of $10,000 in punitive damages against Niles. This substantial award is meant to punish Niles not only for his actions in destroying plaintiff's property, but also for his subsequent attempts to hide his wrongdoing. No interest shall be assessed on this punitive damage award.

### 2. Michael Doyle

Plaintiff has also argued that an award of punitive damages can be assessed against Michael Doyle, the owner of the SEAFARER, under principles of agency law. Plaintiff argues that since Niles' reckless and intentional misconduct occurred during the scope of his employment, Doyle, as principal, can be assessed punitive damages for the acts of his agent.

■ When the principal has neither ratified nor expressly authorized the acts of an agent, courts are divided over the circumstances under which a principal may be held liable for punitive damages. *Muratore v. M/S Scotia Prince*, 845 F.2d 347 (1st Cir. 1988). This division of authority has resulted in three different rules.

A significant number of courts have awarded punitive damages against principals for the tortious acts of their agents, regardless of approval or ratification, as long as those acts occurred within the scope of employment. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 575 n. 14, 102 S.Ct. 1935, 1947 n. 14, 72 L.Ed.2d 330 (1982) (hereinafter *ASME*). The *ASME* rule is based on the premise that principals should be liable for all damages that flow from actions taken by their agents that are committed within their authority.

Another group of courts has declined to follow the *ASME* rule in favor of the rule articulated in *Lake Shore & M.S.R. Co. v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893). The *Lake Shore* rule states that a principal cannot be held liable for the acts of his agent when the master has neither authorized nor ratified such conduct. The ratio-

---

**8.** Facts established through the testimony of Richard Baker.

nale for this rule is that only the guilty offender should have punitive damages assessed against him. This rule has been known as the "complicity rule."

Section 909 of the *Restatement (Second) of Torts* contemplates a third rule. The *Restatement* states

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

(a) the principal or a managerial agent authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

(c) *the agent was employed in a managerial capacity and was acting in the scope of employment,* or

(d) the principal or a managerial agent of the principal ratified or approved the act. (Emphasis added.)

The *Restatement* standard significantly adopts the holding of *Lake Shore,* with one important difference. Section 909(c) of the *Restatement* allows a principal to be held liable for punitive damages, absent ratification or approval, when the agent is employed in a managerial capacity and commits a tortious act within the scope of his employment. This *Restatement* rule has been explicitly adopted in some circuits. *See, e.g., Protectus Alpha Navigation Co. v. North Pacific Grain Growers,* 767 F.2d 1379 (9th Cir.1985); *Thyssen, Inc. v. S.S. Fortune Star,* 777 F.2d 57 (2d Cir.1985).

In *Muratore v. M/S Scotia Prince,* 845 F.2d 347 (1st Cir.1988), the First Circuit considered the question of what circumstances would justify liability of a principal for punitive damages for the tortious acts of an agent. The Court held that the rule articulated in *ASME* was inappropriately broad in the admiralty context. In so holding, the Court favorably cited the more limited rule of *Lake Shore,* stating that principals are clearly liable for punitive damages when they ratify or approve the tortious acts of their agents.

The First Circuit in *Muratore* expressly declined to decide whether the *Restatement* standard articulated in Section 909(c) was applicable in the admiralty context. Deciding that issue was unnecessary on the facts of *Muratore,* since the agent with whose conduct the principal was being charged was clearly not a managerial agent. The agents in that case were photographers who were hired to take pictures of the guests on a cruise ship. The First Circuit, however, gave credence to the *Restatement* rule, by analyzing the facts under both the *Lake Shore* and the *Restatement* rules.

This Court holds that the *Restatement* rule should be applied in admiralty law in determining whether a principal may be held liable for punitive damages for the acts of its agents. Specifically, the Court adopts *Restatement (Second) of Torts* § 909(c) as the basis for liability in this case.

▮ The *Restatement* standard creates appropriate incentives for those who employ captains of vessels. It encourages shipowners to hire qualified and responsible captains and to exercise supervisory power over them. Such supervision would have been particularly helpful in the context of this case. Doyle knew that he had hired his captains to work in an atmosphere characterized in part by the tension that raged between lobstermen and draggers. Doyle's delegation of nearly absolute managerial authority to a captain in this atmosphere does not free him from liability. In fact, it engenders it.

Unlike the dock manager in *Protectus Alpha, supra,* there can be no dispute that Niles was a manager in this case and that Doyle had conferred complete management power upon him. Indeed, Doyle gave all his captains *carte blanche.* He allowed them to hire and fire their crew, to fish how often and for whatever species they chose, and where to sell the fish when they were through fishing. Doyle's only concern was that the captains "brought enough home for dinner." Niles was a manager in every sense of the word, employed by Doyle to control and handle the SEAFARER. *See Block v. R.H. Macy & Co., Inc.,* 712 F.2d 1241, 1247 (8th Cir.1983); *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 771–72 (9th Cir.1984).

This Court does not accept Doyle's statement that he orally told Niles and Smith to avoid the fixed gear. Clearly, the SEAFARER retained no written policies regarding fixed gear. This alleged oral policy stands in contrast to the free license that Doyle gave to his captains with respect to all other aspects of the fishing. Rather, this Court finds that Doyle exercised no supervision over his captains, other than to give them complete managerial discretion over the means and methods of fishing.

By granting the captains *carte blanche* to fish in an atmosphere of hostility such as the one that existed between the lobstermen and the draggers, Doyle authorized any conduct that a captain might take with respect to that conflict. Doyle's faith was well placed in Smith, but misplaced in Niles. By authorizing Niles to use his discretion and by delegating to him complete authority over fishing methods, Doyle becomes liable for the misconduct of Niles.

That the principal in this case is a natural person and not a business entity is of no importance. Whether a natural person or a corporation, a principal is held responsible for the acts of his agent. While it is true that a person can commit misconduct on his or her own, and that a corporation cannot commit misconduct except through the acts of its agents, this rule is a statement about action, not liability. Both corporations, through its agents, and natural persons have a duty to supervise appropriately, regardless of the method by which they act.

Therefore, the Court concludes that an award of punitive damages is appropriate against Doyle in this case. In determining the amount of the award, both the financial status of the defendant as well as the misconduct in which he engaged must be considered. *North Atlantic Fishing, Inc. v. Geremia*, 153 B.R. 607 (D.R.I.1993).

The evidence proves that Doyle's net worth is $455,000. His assets include $12,000 in cash, $150,000 in real estate, $18,000 in personal property, $400,000 in the SEAFARER, $250,000 in the F/V CHARLIE'S PRIDE, and $125,000 in SEP and IRA accounts in two different banks. His liabilities included a $34,000 note payable to Fleet Bank on his house, a $218,904 note on the SEAFARER, a $198,891 note on CHARLIE'S PRIDE, $1,000 on a GMAC pickup, and $3,000 on a '91 GMC Blazer. Thus, in light of these considerations, this Court assesses $50,000 in punitive damages against Doyle under the rule of *Restatement (Second) of Torts* § 909(c). The amount of the award accurately reflects Doyle's ability to pay, and it sends a message to other boat owners that, in the absence of clearly articulated and well known policies regarding the behavior of their captains, owners will be held liable for punitive damages for their captains' recklessness and intentional misconduct.

### III. Conclusion

On Count I, the Clerk will enter judgment for plaintiff against the SEAFARER, Niles and Doyle, jointly and severally in the amount of $6,759.81 plus 6% per annum interest calculated from June 1, 1992 to this date. On Count I, judgment will enter for defendant Smith. On Count II, the Clerk will enter judgment for plaintiff against defendant Niles for $10,000 in punitive damages, and against defendant Doyle for $50,000 in punitive damages. On Count II, judgment will enter for the SEAFARER and defendant Smith. It is so ordered.