## THE LUDLOW.

### JAMES v. WHITNEY & BODDEN et al.

(District Court, N. D. Florida.   March 30, 1922.)

1. Seamen ⊜=30—Seaman held not guilty of willful disobedience, which justified his imprisonment by the master.

A seaman *held* not chargeable with willful disobedience, which would authorize his imprisonment by the master, and awarded $100 damages for confinement in irons for 16 hours.

2. Seamen ⊜=30—Shipowner not liable for punitive damages for assault by master.

Shipowners are not liable for punitive damages for malicious assaults by master on seamen.

3. Seamen ⊜=30—Shipowner may be liable for punitive damages for abuse of seamen, authorized or ratified.

Shipowners may be liable for punitive damages for abuse of seamen, if authorized or ratified by owners.

4. Seamen ⊜=30—Punishment at sea only for willful disobedience.

Punishment may be legally inflicted at sea only when there is willful disobedience of lawful command.

In Admiralty.   Suit by Dalmond James against Whitney & Bodden, a corporation, as owner, and W. A. Cummings, as master, of schooner Ludlow.   Decree for libelant.

⊜=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The facts of this case are substantially stated in the libel filed herein, except as to maliciousness on the part of the master, which allegation was not sustained by proof, to wit:

(1) That the defendants Whitney and Bodden, owners, are residents of Mobile, Ala.; that they are incorporated as Whitney & Bodden; that they are the owners of a certain schooner, to wit, the Ludlow; that the defendant W. A. Cummings is the captain of said schooner, and is in Pensacola, Fla., and within the jurisdiction of this court; that the libelant is in Pensacola, Fla., and within the jurisdiction of this court; that the schooner Ludlow is in the port of Pensacola, and within the jurisdiction of this court.

(2) That on or about the 28th day of January, 1922, the libelant shipped on board the said schooner in Porto Rico as cook; after the vessel was out about 10 days at sea, the said W. A. Cummings, who was captain of said schooner, unjustly accused libelant of being a thief and stealing food supplies from the storeroom; that said master, while on the high seas, ill treated, abused, and kicked libelant, * * * and without just cause or provocation maliciously and unlawfully arrested libelant, put him in rusty irons, and there kept him for the period of 16 hours; that he was confined for that period of time in a dark, dirty, damp, and unsanitary dungeon on said vessel, without food, drink, light, or air during the entire time, and by reason of such brutal and ill treatment of libelant he was chilled, bruised, and made very weak, suffered severe pain and soreness, and continues to suffer much pain in his legs, arms, and chest; that by reason of said false accusations libelant will be greatly handicapped about getting work hereafter.

Libelant alleges that the said W. A. Cummings was prompted to such action by malice; that the said captain had no reason to believe that the libelant would steal, or did steal on that occasion. Libelant claims $3,000 damages.

The answer of the respondent was in the nature of general denial of maliciousness, which answer was sustained by the proof. The answer of respondent further pleaded that the conduct of the master aboard ship was disciplinary and authorized by law.

Walter Kehoe and Alto Adams, both of Pensacola, Fla., for libelant.
Philip D. Beall, of Pensacola, Fla., for respondent.

SHEPPARD, District Judge (after stating the facts as above). This case involves the responsibility of the master for the tort of the agent, growing out of a libel in personam against the master and owners of a ship, for an alleged abuse of the master's authority at sea. There is a clear distinction in the admiralty law between the liability of the owner or principal as a consequence of the tort of the agent, when the act of the agent was in the exercise of delegated authority, or when the voluntary act committed by the agent was prompted by malice or other caprice.

The test of the responsibility of the owner, as recognized in the admiralty law, is whether the tort was committed in the scope of the owner's business or authority, as distinguished from the voluntary act of the servant incident to temperament or impulse, as when the deed may be said to have been done maliciously. When malice actuates the injury, liability of the tort-feasor himself may be twofold: First, for the actual damage sustained; secondly, that which may be awarded as exemplary or punitive. Pacific Packing & Navigation Co. v. Fielding, 136 Fed. 577, 69 C. C. A. 325. The owner or employer is exempt from punitive damages, unless it may be shown that the owner acquiesced in or ratified the wrong, or that the deed was perpetrated in the line

of the agent's authority. Otherwise, he is liable only for actual damages suffered.

The second paragraph of the libel alleges malicious conduct upon the part of the master. Even if the evidence supported this aspect of the controversy, still the owners of the Ludlow, by the weight of authority, would not be liable, since the injured party may look no further for responsibility than to him who committed the malicious act. Pacific P. & N. Co. v. Fielding, supra.

There is present, however, the charge that the conduct of the master placing the libelant in irons was in the course of the owner's employment, in charge of the vessel at the time; unless, therefore, the conduct of the seaman was such provocation to justify the lawful exercise of the master's authority, or if that authority was abused, liability of the owners would follow. To determine that fact, whether the master was in the execution of authority delegated to him by the nature of his employment, or whether the alleged tort was the voluntary malicious act of the master, we must turn to the testimony, which as usual in such cases is conflicting, and more or less unreliable. Parenthetically, it may be observed that about all that is left to the dominion of the master of a ship at sea, to enforce discipline, or to suppress recalcitrant sailors, since the adoption of the Seamen's Act (38 Stat. 1164), is to place the offending seaman in irons. This punishment may follow the willful disobedience of a lawful command of the master; but, to justify it, both elements necessary to the seaman's offense, I take it, should be shown by the evidence; that is, a precedent lawful command and willful disobedience.

It is not clearly or satisfactorily shown what happened between the master and the steward on the poop deck, where the controversy began, for the stories of the occurrences there are conflicting. The master claims the steward pinned him against the wall of the house, and the latter insists that he was only engaged in holding the master's foot, to prevent the master from kicking him. After the master extricated himself from this contact, according to his version, he ordered the steward below, and the steward followed him to the cabin; when it was reached, the master ordered the steward to stop at the door. The latter complied, while the master procured and returned with a gun and irons, and personal conflict between the two was renewed, due, as the master claims, to the steward's physical resistance to the master's efforts to manacle him. The steward's claim is that he objected to the abrasion caused by the rusty surface of the iron on his wrist.

At this juncture it appears the master was not very considerate of the steward's protest, and to subdue the latter the master threatened the use of the gun which lay close by on the table, when it was that the steward sang out, "Get the gun;" it was this exclamation that brought the mate, who entered the cabin and found the steward holding the master by the arms, and O'Garro, one of the seamen, holding the master's revolver, which, according to the testimony of both the master and O'Garro, the latter took from the table. O'Garro and two others of the crew, attracted by the loud talking in the cabin, had preceded the mate by a few seconds; both the mate and O'Garro ordered

the steward to take the irons, which he did readily and without further protest.

The responsibility of the shipowner for anything which may have followed the rencounter between the master and the steward depends upon whether the misconduct was in willful disobedience of the command of the master to take the irons. It may have been a disobedience, and still not willful; his conduct in not submitting to the irons may have been influenced by fear of the master carrying out his threats previously made that he would kill him. The court may properly look at the situation confronting the libelant. The master had a gun in his hand, or within easy reach. He had repeatedly threatened the libelant, if he did not submit to his orders. The court is impressed with the unseemly manner the master went about enforcing discipline on this ship. The dignity of his authority would be best preserved by directing the mate to place the irons, or to at least summons his presence in the performance of such a task. The circumstances confronting the seaman may have reduced him to a feeling of future helplessness, if he submitted to the master's demands. The master was excited, and, if any of the witnesses are to be believed, was quite angry with the steward. When the mate and seaman arrived, there was no further show of resistance upon the part of the libelant. It may be that libelant felt more security in the presence of the crew than when alone with the indignant master, who admittedly had access to the gun.

Furthermore, the provisions of the La Follette Seamen's Act (paragraph 4, c. 8, Annotated Statutes of U. S. [2d Ed.] vol. 9, p. 215 [Comp. St. § 8380]) are reciprocal, and the duty of the master to make note of and to follow the redress afforded by the statute for any willful disobedience at sea is as imperative as is the duty of the seaman to obey lawful commands. The seaman was subject to court trial and punishment after the vessel reached port, but the master made no complaint of the affair. If any log of the incident was preserved, it was not produced at this hearing. The best evidence of the good faith of the master. as well as of the occurrence itself, is the entry in the log, No reason is given why this entry was not made or reported to the proper officials when the vessel arrived in port, nor is any sufficient excuse proffered why the master, assumed to be both lawgiver and executioner at the same time, especially when it concerned a seaman, of whom he was suspicious, and who had been "ugly" before on the voyage. In the circumstances of the case, the court is inclined to the view that the master was unduly hasty in the premises, and probably proceeded upon the assumption that the libelant would disobey him, and his faith in this conjecture needed no evidence.

The steward's story that he was not disobeying, but merely preventing the master from executing his threats, is entitled to some credence, in view of the master's personal assumption of a duty, when he could just as well have delegated it to another, who entertained probably less feeling against the libelant. The conduct of the steward in wrangling with the master or laying hands on the master at sea is not to be condoned, and the only excuse for any disobedience, which may be tolerated, is the state of fear or apprehension in which the inexcusable

conduct of the master may have placed him. At any rate the willful disobedience, which alone would justify the punishment inflicted, is not established by the preponderance of the evidence adduced here. However, the damage to the steward recoverable by this libel being limited to injury to his health or person, of which the evidence shows none, the only thing for which he may be compensated is the discomfort of 16 hours' confinement in the lazarette. I conclude that nominal damages is sufficient reparation.

For this inconvenience, $100 will be awarded; each party paying his costs.