December 7, 1995 United States Court of Appeals
For the First Circuit


No. 95-1462

CEH, INC.,

Plaintiff, Appellee,

v.

F/V SEAFARER (ON 675048), ET AL.,

Defendants, Appellants.



ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on November 28, 1995 is
corrected as follows:

On page 11, line 15 - insert the following text after
"Moragne, 398 U.S. at 401-02": "(quoting The Lottawanna, 88 U.S. 
(21 Wall.) 558, 575 (1875))".

On page 12, line 10 - change "and" to "[and]". 

On page 13, last line - insert the following text after
"(5th Cir. 1995)": "(en banc)".

On page 14 - delete footnote 9.

On page 22, first paragraph, line 11 - change "[Lake 
Shore.]" to "Lake Shore . . . ." 

United States Court of Appeals
For the First Circuit


No. 95-1462

CEH, INC.,

Plaintiff, Appellee,

v.

F/V SEAFARER (ON 675048), ET AL.,

Defendants, Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge] 



Before

Boudin, Circuit Judge, 
Coffin and Aldrich, Senior Circuit Judges. 



Leonard W. Langer with whom Marshall J. Tinkle was on brief 
for appellants.
Mark A. McSally for appellee. 



November 28, 1995


COFFIN, Senior Circuit Judge. Defendant-appellants, the F/V 

SEAFARER, a fishing trawler, and Michael Doyle and Charles Niles,

its owner and captain respectively, appeal the district court's

decision after a bench trial finding them liable for the

destruction of appellee's lobstering gear and imposing

compensatory and punitive damages. CEH, Inc. v. F/V Seafarer, 

880 F. Supp. 940 (D.R.I. 1995). Defendants challenge, inter 

alia, the sufficiency of the evidence, the availability of 

punitive damages as a matter of law, and the district court's

adoption of the Restatement (Second) of Torts 909 as a basis 

for vicarious liability. We affirm.

I. BACKGROUND I. BACKGROUND

The facts, as the court found them, are as follows.

Plaintiff-appellee CEH, Inc. ("CEH") owns the F/V COURTNEY

ELIZABETH, an off-shore lobstering vessel based in Point Judith,

Rhode Island. During May and June of 1992, CEH owned 4,200

lobster traps, 2,857 of which were grouped off shore in

arrangements referred to as "lobster trawls." A lobster trawl

consists of 40 to 55 traps connected to each other by a ground

line. Each end of the ground line is attached to a blivet, a

cement block that keeps the trawl in place. A rope extends from

the top of each blivet to a high flier, a floatable device that

consists of ring floats, an aluminum pole and a flag, and which

is often marked with radar reflectors. The high fliers mark the

location of the lobster traps below.

-3-

The COURTNEY ELIZABETH regularly tended to these lobster

traps, but between May 13, 1992 and June 7, 1992, she was ashore

undergoing repairs. From May 19 to May 23, another vessel hauled

and reset the traps. Upon returning to duty on June 7, the crew

of the COURTNEY ELIZABETH discovered that 1,093 traps and related

equipment were missing. Subsequently, CEH brought this action

against defendants, alleging that during two trips between May 23

and June 7, the SEAFARER dragged through CEH's trawls and

destroyed 671 traps.1

The SEAFARER is a trawler that drags for fish by way of a

net extending beyond its stern. During May and June, 1992, the

SEAFARER was dragging for monkfish, a fish found near the ocean

floor, often in close proximity to high concentrations of

lobster. The shared migrations of these species typically cause

an overlap in the operating areas of draggers and lobstermen,

causing tensions between the two groups. The close quarters

result in inevitable gear conflicts, with trawlers often hauling

up lobster traps unintentionally. Trawlers generally dispose of

damaged, destroyed or abandoned traps ("ghost gear"), but

customarily return working traps ("fixed gear") to their owner. 

During her first trip, May 23 to May 24, the SEAFARER

operated under the direction of Captain Roger Smith, with Charles

Niles serving as mate. On May 24, the captain of another

lobstering vessel observed the SEAFARER in the area of several of
 

1 CEH initially accused defendants of destroying all 1,093
traps, but amended this figure upon discovering that the SEAFARER
did not tow in certain regions. 

-4-

the COURTNEY ELIZABETH's trawls, and, through his wife, informed

Timothy Handrigan, the vice-president of CEH, that his lobster

trawls were at risk. The next day, Handrigan called Niles in

order to advise Niles of the location of his gear. Niles

responded that he did not need this information.

Niles captained the second trip of the SEAFARER, from May 28

through June 7, 1992. Also on board were John McKay (mate), and

deckhands Phien Hoang, Niles Pearsall and Richard Baker. Except

for Baker, who was Captain Niles' nephew, all crewmembers

regularly worked on the SEAFARER. On May 29, Captain Robert

Buffinton of the F/V EDNA MAE observed the SEAFARER near fixed

gear of the COURTNEY ELIZABETH. Upon approaching the SEAFARER,

he observed 20 unidentifiable lobster traps on board its deck. 

Over the next few days, the SEAFARER hauled up and discarded

approximately 200 traps, about 140 of which constituted fixed

gear. In addition, the crew cut loose trawl lines that became

entangled in the nets of the vessel. In total, the SEAFARER

destroyed 134 of CEH's traps.

CEH commenced this action against the ship's owner, Doyle,

and the two captains, Niles and Smith, in personam, and the

SEAFARER in rem, pursuant to the district court's maritime

jurisdiction. See 28 U.S.C. 1333; Executive Jet Aviation, Inc. 

v. City of Cleveland, 409 U.S. 249 (1972). CEH sought 

compensatory damages for negligence, and punitive damages for the

willful destruction of its property. Following a bench trial,

the court absolved Captain Smith of all liability, but found

-5-

Niles and the vessel at fault for destroying plaintiff's gear.

The court further found that Niles acted in reckless disregard of

CEH's property rights by towing through its fixed gear, and that

he acted intentionally and maliciously in ordering his crew to

cut trawl lines. The court awarded CEH compensatory damages in

the amount of $6,759.81 jointly and severally against all

parties, punitive damages against Captain Niles in the amount of

$10,000, and punitive damages against Michael Doyle in the amount

of $50,000.

Defendants attack the legal and factual bases of the court's

award. We address these issues seriatim.

II. SUFFICIENCY OF THE EVIDENCE II. SUFFICIENCY OF THE EVIDENCE

To establish liability for negligence under general maritime

law, CEH needed to prove by a preponderance of the evidence that

the SEAFARER destroyed CEH's traps, and that such destruction

could have been reasonably avoided. 1st Bank Southeast of 

Kenosha, Wis. v. M/V Kalidas, 670 F. Supp. 1421, 1431 (E.D. Wis. 

1987); see Burgess v. M/V Tamano, 564 F.2d 964, 977 (1st Cir. 

1977). 

Defendants' core argument is that the evidence fails to

demonstrate that the SEAFARER destroyed any of CEH's traps. We

review this factual issue in accordance with the "clearly

erroneous" standard of Fed. R. Civ. P. 52(a). DiMillo v. 

Sheepscot Pilots, Inc., 870 F.2d 746, 749 (1st Cir. 1989). 

Unless, after examining the record and according due deference to

the trial court, we form a "strong unyielding belief that a

-6-

mistake has been made," we will adopt the court's findings. Juno 

SRL v. S/V Endeavour, 58 F.3d 1, 4 (1st Cir. 1995). 

The district court determined that the SEAFARER destroyed

134 of CEH's traps and related gear through the following

specific findings: the SEAFARER dragged through Trawl 114 (50

wire traps) on May 31, and Trawls 16 (50 wire traps) and 60 (34

A-frame wooden pots) on June 1, 1992. In arriving at these

findings, the district court relied on a wealth of circumstantial

evidence, all of which is set forth in the district court's

opinion, and need not be repeated here in entirety. After

scrutinizing this evidence, we conclude that the inferences drawn

by the district court were plausible. As such, we affirm the

court's findings. Cumpiano v. Banco Santander Puerto Rico, 902 

F.2d 148, 152 (1st Cir. 1990) (quoting Anderson v. City of 

Bessemer City, 470 U.S. 564, 573-74 (1985) ("If the district 

court's account of the evidence is plausible in light of the

record reviewed in its entirety, the court of appeals may not

reverse it even though convinced that had it had been sitting as

the trier of fact, it would have weighed the evidence

differently.")).

In light of the factual complexity of this case, we will

discuss in some detail the key evidence that supports the court's

findings. The court relied primarily on the testimony of crewman

Baker, and on a comparison of the logbooks of the SEAFARER and

the COURTNEY ELIZABETH.

-7-

Baker testified that during the trip: 1) the SEAFARER often

operated within 50 to 100 yards of high fliers; 2) a high flier

belonging to CEH was towed behind the boat; 3) about 200 traps

were brought on deck of the SEAFARER and dumped overboard; 4)

approximately 140 of these traps were reusable, and roughly 115

of these belonged to the COURTNEY ELIZABETH; and 5) Baker and

other crewmembers regularly cut trawl lines that hung up on the

doors of the net. Baker also asserted that after the trip,

Charles Niles phoned him in an effort to induce Baker to alter

his recollection of the trip.

Baker's testimony, taken alone, permits a reasonable

inference that the SEAFARER destroyed a number of CEH's traps.

In response, defendants argue that each of Baker's assertions is

in conflict with the testimony of the other crewmembers and

Captain Niles. The district court, however, was within its

prerogative to find Baker "wholly credible" while disbelieving

the other witnesses. See Rivera-Gomez v. de Castro, 900 F.2d 1, 

4 (1st Cir. 1990).

To pinpoint the dates on which specific trawls were

destroyed, the court used the log books of both vessels to plot

the course of the SEAFARER against the position of the COURTNEY

ELIZABETH's lobster trawls. The court determined that the

SEAFARER's path intersected the groundlines of the three trawls

on May 31 and June 1. 

Defendants contend that inherent inaccuracies in the Loran

system and rounding errors in the log books render a comparison

-8-

of the logs misleading. Their expert, Thomas Bushy, testified

that the cumulative effect of all possible errors could cause two

separately recorded identical readings to be up to 1.6 nautical

miles apart. Nevertheless, on cross examination, Bushy admitted

that this figure was the absolute worst case scenario; that, in

fact, he did not know whether either vessel's system contained

correction factors that would have reduced possible error; and

that the locations of the tows and the trawls could have been

much closer together. Upon examining the whole of Bushy's

testimony, we find no error in the court's plotting of Loran

coordinates to reach its specific findings. 

Baker's testimony, in conjunction with the court's analysis

of the ship logs, provides sufficient evidence to support the

court's conclusion that the SEAFARER destroyed Trawls 16, 60 and

114 on May 31 and June 1, 1992. Niles' failure to take any steps

to avoid CEH's traps, as demonstrated by his disregard for the

presence of high fliers and his rejection of the information

offered by Handrigan, establish, at the very least, negligence on

his part.

Because the facts set forth above sufficiently support the

court's disposition, we need not address defendants'

miscellaneous objections to other pieces of circumstantial

evidence. In any event, we find them unpersuasive. We uphold

the court's finding of negligence and its concomitant award of

compensatory damages. 

III. PUNITIVE DAMAGES III. PUNITIVE DAMAGES

-9-

The defendants raise four challenges to the award of

punitive damages: 1) both Niles and Doyle claim that punitive

damages are unavailable as a matter of law in a maritime case; 2)

both claim that punitive damages are unjustified by the

underlying conduct in this case; 3) Doyle claims that such

damages may not be awarded against him through vicarious

liability; and 4) both claim that the awards imposed against them

are excessive. 

A. Punitive Damages Under General Maritime Law A. Punitive Damages Under General Maritime Law

We review de novo the district court's determination that 

punitive damages are recoverable pursuant to plaintiff's general

maritime claims. See In re Extradition of Howard, 996 F.2d 1320, 

1327 (1st Cir. 1993). 

Although rarely imposed, punitive damages have long been

recognized as an available remedy in general maritime actions

where defendant's intentional or wanton and reckless conduct

amounted to a conscious disregard of the rights of others. See 

The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 558 (1818) (criminal 

trespass); Muratore v. M/S Scotia Prince, 845 F.2d 347, 354 (1st 

Cir. 1988) (intentional infliction of emotional distress);

Protectus Alpha Navigation Co. v. North Pacific Grain Growers, 

767 F.2d 1379, 1385 (9th Cir. 1985) (destruction of property);

Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051-52 (1st Cir. 

1973) (willful failure to pay maintenance and cure); In re Marine 

Sulphur Queen, 460 F.2d 89, 105 (2d Cir. 1972) (wrongful death); 

Pino v. Protection Maritime Ins. Co., 490 F.Supp. 277, 281 (D. 

-10-

Mass. 1980) (tortious interference with employment rights);

Dredge General, 1944 A.M.C. 948, 948 (S.D. Fla. 1944) (property 

damage); The Ludlow, 280 F. 162, 163 (N.D. Fla. 1922) (malicious 

and unlawful arrest); The Seven Brothers, 170 F. 126, 127 (D.R.I. 

1909) (property damage); Gallagher v. The Yankee, 9 F. Cas. 1091, 

1093 (N.D. Cal. 1859) (No. 5,196) (unlawful deportation), aff'd, 

30 F. Cas. 781 (C.C.N.D. Cal. 1859) (No. 18,124); Ralston v. The 

States Rights, 20 F. Cas. 201, 209-10 (E.D. Pa. 1836) (No. 

11,540) (collision).

Nevertheless, in the wake of Miles v. Apex Marine Corp., 498 

U.S. 19 (1990), courts have been increasingly hesitant to allow

punitive damages in certain general maritime actions involving

personal injury or death. In Miles, the Court held, inter alia, 

that damages recoverable in an action for the wrongful death of a

seaman do not include loss of society. Id. at 37. In reaching 

this conclusion, the Court enunciated principles of uniformity

relevant to wrongful death actions, and more broadly, to maritime

tort law, which have moved subsequent courts to limit recovery in

other similar contexts. Defendants ask us to extend Miles to bar 

recovery of punitive damages in all general maritime cases.

However, as described more fully below, we believe Miles is 

inapposite to plaintiff's maritime claim.

In Miles, the mother of a deceased seaman brought a wrongful 

death action sounding both in negligence under the Jones Act, and

unseaworthiness under the general maritime law. In denying

recovery for loss of society, a form of nonpecuniary relief, the

-11-

Court ensured a uniform scheme of recovery regardless of whether

a wrongful death action was brought under the Death on High Seas

Act (DOHSA),2 the Jones Act3 or general maritime law.4 The

statutory actions provided only for pecuniary relief: the DOHSA

explicitly5 and the Jones Act implicitly, through its

incorporation of the Federal Employers' Liability Act (FELA),

which, prior to the enactment of the Jones Act, had been

construed to allow only pecuniary relief. Miles, 498 U.S. at 32 

(citing Michigan Cent. R. Co. v. Vreeland, 227 U.S. 59, 69-71 

(1913)). The Court extended this restriction to the

unseaworthiness claim, explaining that "[i]t would be

inconsistent with our place in the constitutional scheme were we

to sanction more expansive remedies in a judicially created cause

of action in which liability is without fault than Congress has

 

2 DOHSA, 46 U.S.C. 761, authorizes the personal
representative of the decedent to bring an action "[w]henever the
death of a person shall be caused by wrongful act, neglect, or
default occurring on the high seas." 

3 The Jones Act, 46 U.S.C. 688, provides that a seaman
injured in the course of employment, or his representative in
case of death, may "maintain an action for damages at law . . .
and in such action all statutes of the United States modifying or
extending the common-law right or remedy in cases of personal
injury to railway employees shall apply."

4 In Moragne v. States Marine Lines, Inc. 398 U.S. 375, 409 
(1970), the Court recognized a wrongful death action under
general maritime law. Prior to Moragne, plaintiffs not 
satisfying the requirements of DOHSA or the Jones Act had to rely
on state wrongful death acts, which, if they existed, varied
greatly in nature and scope.

5 Recovery under DOSHA is limited to "the pecuniary loss
sustained by the persons for whose benefit the suit is brought."
46 U.S.C. 762.

-12-

allowed in cases of death resulting from negligence." Id. at 

33.6 

The Court's decision to "restore a uniform rule applicable

to all actions for the wrongful death of a seaman," id., 

logically followed the principle espoused in Moragne, 398 U.S. at 

401-02 (quoting The Lottawanna, 88 U.S. (21 Wall.) 558, 575 

(1875)), to promote "uniformity [that] not only will further the

concerns of both of the 1920 Acts but also will give effect to

the constitutionally based principle that federal admiralty law

should be 'a system of law coextensive with, and operating

uniformly in, the whole country.'" Though these principles of

uniformity defy precise limits, we think it clear that the

Supreme Court had in mind the need to defer to statutory

enactments addressing like issues. As the Court reasoned: "In

this era, an admiralty court should look primarily to these

legislative enactments for policy guidance. . . . [and] must be

vigilant not to overstep the well-considered boundaries imposed

by federal legislation." Miles, 498 U.S. at 27. Miles, 

therefore, does not, as defendants contend, signify a call for

universal uniformity of maritime tort remedy, but rather

 

6 A shipowner's breach of the warranty of seaworthiness, a
strict liability obligation, see Miles, 498 U.S. at 25, provided 
a basis of liability under the general maritime law. Therefore,
a plaintiff suing for the wrongful death of a seaman could bring
a Jones Act claim, which required a showing of negligence, and/or
a general maritime unseaworthiness claim, which required no
showing of fault. Yet under the unseaworthiness claim, a
plaintiff could anticipate, potentially, a much greater recovery
than under the Jones Act.

-13-

emphasizes the importance of uniformity in the face of applicable

legislation.

The cases post-Miles reflect this focus on relevant 

legislation. If the factual situation could support an action

under either DOHSA or the Jones Act, then nonpecuniary relief is

unavailable. See, e.g., Horsley v. Mobil Oil Corp., 15 F.3d 200, 

203 (1st Cir. 1994) (punitive damages not recoverable in

unseaworthiness action for injured seaman); Miller v. American 

President Lines, Ltd., 989 F.2d 1450, 1459 (6th Cir. 1993) 

(punitive damages not available in unseaworthiness action for the

wrongful death of a seaman); Rollins v. Peterson Builders, Inc., 

761 F. Supp. 943, 950 (D.R.I. 1991) (same).

The import of this legislation in the context of personal

injury has led some courts to bar nonpecuniary relief in

circumstances addressed by the Jones Act, but involving non-Jones

Act plaintiffs and defendants. See, e.g., Wahlstrom v. Kawasaki 

Heavy Industries, Ltd., 4 F.3d 1084, 1094 (2d Cir. 1993) 

(concluding, based in large part on post-Miles authority, that 

representatives of a deceased nonseaman could not recover 

punitive damages under the general maritime law); Trahan v. 

Texaco, Inc., 625 So.2d 295, 297 (La. App. 4th Cir. 1993) 

(dismissing a general maritime claim for loss of consortium

brought by a seaman's spouse against nonemployer third-party 

defendants); but see, e.g., Emery v. Rock Island Boatworks, 847 

F. Supp. 114, 117-18 (C.D. Ill. 1994) (injured passenger's

husband could recover nonpecuniary damages because his claim not

-14-

cognizable under the Jones Act or DOHSA and, therefore, concerns

for uniformity do not exist); Sugden v. Puget Sound Tug & Barge 

Co., 796 F. Supp. 455, 457 (W.D. Wash. 1992) (wife of deceased 

seaman could recover nonpecuniary damages from non-employer

because husband was not a Jones Act seaman for purposes of the

suit).

Recently, the Fifth Circuit held that cure and maintenance

claims, often considered to lack a statutory counterpart, see 

Anderson v. Texaco, Inc., 797 F. Supp. 531, 536 (E.D. La. 1992), 

were, in fact, governed by Miles. Guevara v. Maritime Overseas 

Corp., 59 F.3d 1496, 1512 (5th Cir. 1995) en banc; see also Glynn 

v. Roy Al Boat Management Corp., 57 F.3d 1495 (9th Cir. 1995).7 

While at first glance, Guevara may seem to provide comfort to 

defendants, a closer reading supports our belief that Miles 

simply is irrelevant here.

Guevara followed the approach set forth in Miles. First, 

the court determined whether the factual setting of the case was

covered by a statute like the Jones Act or DOHSA. 59 F.3d at

1506. Then, upon finding a statutory/general maritime law

overlap,8 the court invoked the "Miles damages uniformity 
 

7 Glynn and Guevara reached identical results through 
different means. Though concluding that limiting recovery in
cure and maintenance claims was consistent with Miles, the Ninth 
Circuit relied primarily on its conclusion that there was no
legal support for punitive damages in such cases. 57 F.3d at
1504-05.

8 The Fifth Circuit delineated two types of maintenance and
cure actions: one based in tort involving the deterioration of a
seaman's health due to failure to provide maintenance and cure;
and one based in contract, not requiring personal injury, but

-15-

principle" and excluded punitive damages. Id. at 1512-13. As 

the court reasoned, "[i]t makes little sense to create a

fragmentation of admiralty law by allowing punitive damages in

one class of maintenance and cure cases" while disallowing them

in another. Id. at 1513.  

Guevara does not assist defendants in any way. Rather, it 

merely illustrates, as do the other post-Miles cases cited above, 

that Miles may be applicable in those areas of maritime law 

where, at the very least, there is an overlap between statutory

and decisional law. In the instant case, however, there is no

legislation whatever that touches upon circumstances involving

the reckless or willful destruction of property. Quite simply,

Congress has not spoken, and we consequently see no basis under

Miles for barring nonpecuniary relief here.  

Defendants' contention that it would be peculiar to provide

plaintiffs greater relief for property damage than for personal

injury has some force. The concern expressed in Miles, however, 

was not with respect to an award of nonpecuniary damages in

maritime cases in general, but with inconsistency with

Congressional pronouncement. Miles does not mandate a uniform 

result for every maritime action and we are hesitant to ascribe

to the Court a holding that goes well beyond any issue discussed

 

claiming reimbursement for the personal outlay of funds. Even
though Guevara brought the latter type of claim, because the
tort-like action "overlaps with the personal injury coverage of
the Jones Act," id. at 1511, the court concluded that the 
legislative scheme affected his recovery. 

-16-

there. See United States v. London, 66 F.3d 1227, 1241 (1st Cir. 

1995). 

In sum, in the absence of any relevant legislation, we think

that the uniformity principle enunciated in Miles is 

inapplicable. Therefore, plaintiffs are entitled to forms of

relief traditionally available under the general maritime law,

including punitive damages. Accordingly, we affirm the district

court's determination that punitive damages are recoverable under

plaintiff's general maritime claim.

B. Niles' Conduct B. Niles' Conduct

Having held that punitive damages are available, we now

address defendants' claim that the district court erred in

finding that Niles' conduct warranted them.

The award of punitive damages is within the sound discretion

of the district court. Muratore, 845 F.2d at 354. We review the 

factual findings in support of the award for clear error. Bergen 

v. F/V St. Patrick, 816 F.2d 1345, 1349 (9th Cir. 1987). And we 

reiterate that the only circumstances that support an award of

punitive damages are "where defendant's actions were intentional,

deliberate or so wanton and reckless as to demonstrate a

conscious disregard of the rights of others." Muratore, 845 F.2d 

at 354.

The court awarded punitive damages upon finding that Niles

acted in reckless disregard for the property rights of CEH in

towing through its trawls, and acted intentionally and

maliciously in destroying trawl lines and traps. In reaching

-17-

these conclusions, the district court relied on evidence

pertaining to the time before, during and after the conduct in

question. 

The testimony indicated that prior to May 1992, apart from

the general conflict between lobstermen and trawlers, Niles and

the Handrigans had been involved in a dispute over a generator.

As a result of this row, Niles, as a matter of custom, refused to

return any gear to the COURTNEY ELIZABETH regardless of its

condition. Niles also acknowledged that, at the time of the

trip, he was aware that the COURTNEY ELIZABETH was laid up

undergoing repairs.

Niles' actions during the trip, as reported by Baker,

directly support the court's findings. Early on, Niles ordered

that "no gear comes home, and all traces of lines and stuff go

over board." Later, Niles operated the SEAFARER in close

proximity to high fliers, and at one point, dragged a high flier

behind the boat. His crewmen cut and disposed of trawl lines

that became entangled in the nets of the SEAFARER, and dumped

overboard all gear brought on board, including all workable

traps. Niles even joked about selling gear back to the owner.

After the trip, Niles phoned Baker in an effort to influence

Baker to change his story. The district court, quite accurately,

characterized Niles' explanation of this call -- to get Baker's

phone number -- as "to say the least foolish, circuitous, and

illogical."

-18-

Defendants, again, protest that these findings are based

solely on Baker's testimony; again, this is of no avail. See 

Rivera-Gomez, 900 F.2d at 4. And, even if defendants are correct 

that there is inconclusive proof that each line cut or each trap

dumped belonged to CEH, the record contains more than enough

factual support to demonstrate Niles' willful and malicious

conduct toward CEH. Therefore, we affirm the court's award of

punitive damages against Niles. 

C. Vicarious Liability C. Vicarious Liability

The district court found Doyle liable for punitive damages

under the standard enunciated in Restatement (Second) of Torts  

909(c),9 because Doyle delegated "nearly absolute managerial

authority" to Niles. The adoption of the Restatement rule as a 

basis of liability is a question of first impression in this

circuit, although we alluded to it in Muratore, 845 F.2d at 354- 

 

9 Section 909 states:

Punitive damages can properly be awarded against a
master or other principal because of an act by an
agent, if but only if, 

(a) the principal or a managerial agent authorized the
doing and the manner of the act, or

(b) the agent was unfit and the principal or a
managerial agent was reckless in employing or retaining
him, or

(c) the agent was employed in a managerial capacity and 
was acting in the scope of employment, or 

(d) the principal or a managerial agent of the
principal ratified or approved the act.

(Emphasis added.)

-19-

56. Muratore concerned the liability of a ship charterer 

for the acts of ship photographers that constituted intentional

infliction of emotional distress. We discussed three approaches

courts have taken when addressing the liability of a principal

who neither authorizes nor ratifies her agent's misconduct.

Under the majority approach, punitive damages are treated

indistinguishably from compensatory ones, and traditional

respondeat liability attaches. Id. at 354. Principals are held 

accountable for their agents' misdeeds that occur within the

scope of employment. In contrast, a significant minority of

courts follow the strict complicity rule of Lake Shore & M.S.R. 

Co. v. Prentice, 147 U.S. 101 (1893), which limits principal 

liability to those acts participated in, authorized or ratified.

Finally, the Restatement rule incorporates the Lake Shore 

limitation but extends liability, regardless of authorization or

ratification, to acts committed by a managerial agent within the

scope of employment. 845 F.2d at 355.

In Muratore, we declined to follow the majority view, 

favoring a more limited approach to "ensure that punitive damages

are awarded against the guilty offender." Id. Further 

discriminating between the latter two formulations was

unnecessary as the plaintiff did not satisfy the requirements of

either one. Now, however, our determination of Doyle's liability

hinges upon which standard we adopt, because although there is no

evidence that Doyle authorized, ratified or participated in the

-20-

wrongdoing, it is clear that Niles meets the "managerial

capacity" criteria.

We turn first to precedent. In The Amiable Nancy, the 

Supreme Court rejected the imposition of punitive damages against

the owners of THE SCOURGE for the privateering acts of her

captain and crew because "[the owners] are innocent of the

demerit of this transaction, having neither directed it, nor

countenanced it, nor participated in it in the slightest degree."

16 U.S. (3 Wheat.) 546, 559 (1818). The requirement of

complicity of some sort became further entrenched in Lake Shore, 

where in rejecting a punitive award against a railway for the

harassing conduct of its train conductor, the Court stated:

Exemplary or punitive damages, being awarded, not
by way of compensation to the sufferer, but by way of
punishment of the offender, and as a warning to others,
can only be awarded against one who has participated in
the offence. A principal, therefore, though of course
liable to make compensation for injuries done by his
agent within the scope of his employment, cannot be
held liable for exemplary or punitive damages, merely
by reason of wanton, oppressive or malicious intent on
the part of the agent.

147 U.S. at 107. Although Lake Shore was not an admiralty case, 

a number of admiralty courts have followed this proposition,

rejecting liability absent principal complicity of some sort.

See, e.g., Matter of P & E Boat Rentals, Inc., 872 F.2d 642, 652 

(5th Cir. 1989); U.S. Steel Corp. v. Fuhrman, 407 F.2d 1143, 1148 

(6th Cir. 1969); Jones v. Compagnie Generale Maritime, 882 F. 

Supp. 1079, 1086 (S.D. Ga. 1995); The Seven Brothers, 170 F. 126, 

127 (D.R.I. 1909). 

-21-

In Fuhrman, the Sixth Circuit reversed an award of punitive 

damages against U.S. Steel for the actions of one of its captains

who decided to try to beach his holed vessel rather than abandon

ship. The court took the position that the captain in good faith

used his best judgment, not irrational under the circumstances,

"for the benefit of all concerned." 407 F.2d at 1147. Rather

than rest on this conclusion, which would make unnecessary any

consideration of the vessel owner's liability, the court opined

that "even if" the captain's actions warranted punitive damages:

We think the better rule is that punitive damages
are not recoverable against the owner of a vessel for
the act of the master unless it can be shown that the
owner authorized or ratified the acts of the master
either before or after the accident. Punitive damages
also may be recoverable if the acts complained of were
those of an unfit master and the owner was reckless in
employing him.

Id. at 1148. 

The Fifth Circuit followed Fuhrman in Matter of P & E Boat 

Rentals, Inc., 872 F.2d at 652. That case involved multiple 

wrongful death and personal injury claims brought against

Chevron, USA, following a serious collision caused in part by

Chevron foremen who directed a charter vessel to operate in

extremely foggy conditions. The court observed that the foremen

were low level supervisors with no policymaking authority and

stated: 

We hold simply that punitive damages may not be
imposed against a corporation when one or more of its
employees decides on his own to engage in malicious or
outrageous conduct. In such a case, the corporation
itself cannot be considered the wrongdoer. If the
corporation has formulated policies and directed its
employees properly, no purpose would be served by

-22-

imposing punitive damages against it except to increase
the amount of the judgment.

Id. 

In contrast, the Ninth Circuit, in Protectus Alpha 

Navigation Co. v. North Pacific Grain Growers, Inc., 767 F.2d 

1379 (9th Cir. 1985), expressly adopted the Restatement rule. In 

that case, North Pacific's dock foreman set adrift a burning

vessel in defiance of firemen's orders. This conduct in part

caused the destruction of the vessel and the death of a fireman.

Because the foreman acted with "reckless or callous disregard"

for the rights of Protectus Alpha, and because he was a

managerial employee of North Pacific acting in the scope of his

employment, the court upheld the imposition of punitive damages

against North Pacific. Id. at 1385-87. 

Justifying its adoption of the Restatement rule, the court 

reasoned:

We believe the standard of the Restatement better
reflects the reality of modern corporate America. We
agree that a corporation can act only through its
agents and employees, and that no reasonable
distinction can be made between the guilt of the
employee in a managerial capacity acting within the
scope of his employment and the guilt of the
corporation. 22 Am.Jur.2d, Damages 261 (1965). It
seems obvious that no corporate executive or director
would approve the egregious acts to which punitive
damages would attach, and, therefore, no recovery for
more than compensatory damages could ever be had
against a corporation if express authorization or
ratification were always required.

Id. at 1386. 

In sum, both approaches draw support from precedent.

Although the Supreme Court cases cited adopted the strict

-23-

complicity view, we do not believe the early nineteenth century

decision in The Amiable Nancy and the late nineteenth, 

nonadmiralty decision in Lake Shore dictate the result here. 

Neither considered the more modern concerns reflected in the

contrary caselaw and, indeed, the Court has indicated that Lake 

Shore may have been unduly restrictive even for its own time. 

American Society of Mechanical Engineers, Inc. v. Hydrolevel 

Corp., 456 U.S. 556, 575 n.14 (1982) ("[T]he Court may have 

departed from the trend of late 19th-century decisions when it

issued Lake Shore."). We note, moreover, that most courts 

outside the maritime context do not follow Lake Shore. Id.; W. 

Page Keeton, et al., Prosser and Keeton on the Law of Torts 13 

(5th ed. 1984). This growing body of precedent is of

significance because we discern no reason, and defendants point

to none, why vicarious liability should be treated differently on

sea than on land. See Archer v. Trans/American Services, 834 

F.2d 1570, 1573 (11th Cir. 1988) ("Federal maritime law embraces

the principles of agency."). After all, Lake Shore itself, 

though repeatedly cited by admiralty courts, was not a maritime

case. 

After giving both perspectives due consideration, we

conclude that strict adherence to the complicity approach would

shield a principal, who, though not guilty of direct

participation, authorization or ratification in his agent's

egregious conduct, nevertheless shares blame for the wrongdoing.

Therefore, we believe that some features of the Restatement 

-24-

approach are helpful here. In our view, imposing vicarious

liability on a principal for the act of an agent employed in a

managerial capacity and acting in the scope of employment

represents an appropriate evolution of the Lake Shore rule, at 

least when linked to requiring some level of culpability for the

misconduct. 

Our approach today falls short of wholesale adoption of the

Restatement because section 909(c), read literally, could impose 

liability in circumstances that do not demonstrate any fault on

the part of the principal. Because this is not such a case,

however, we need not resolve whether the Restatement's vicarious 

liability principle would in fact reach so far.

Whatever the outer parameters of "managerial capacity"

liability may be, the district court supportably found that the

circumstances here justified the imposition of punitive damages

against Doyle. In so concluding, the district court discussed at

some length the intertwined issues of Niles' managerial authority

and Doyle's culpability in failing to supervise Niles. Niles had

total authority to hire and fire the crew, to determine the

duration, location and targets of the trips, and to sell the

catch wherever he chose. In short, Niles had "complete

managerial discretion over the means and methods of fishing."

Niles set forth and implemented whatever policy, if any, the crew

of the SEAFARER followed. Moreover, the decisions made by Niles

directly affected the success of Doyle's fishing business. 

-25-

This delegation of complete managerial discretion was made

notwithstanding Doyle's knowledge that "he had hired his captains

to work in an atmosphere characterized in part by the tension

that raged between lobstermen and draggers." Not only was there

a complete delegation of authority in a troublesome work

situation, but also a complete absence of any policy directive,

written or oral, regarding the operation of Doyle's vessels in

lobster trawl areas. This combination of circumstances places

this case well within the sphere of culpability.10 

As applied here, the imposition of punitive damages, in the

district court's words, "encourages shipowners to hire qualified

and responsible captains and to exercise supervisory power over

them." In addition, it fairly punishes Doyle for his failure to

provide any supervision over his captains. In short, therefore,

the district court's award properly serves the purposes of

punitive damages: "to punish defendant and to deter others from

engaging in like manner." Muratore, 845 F.2d at 354. 

Accordingly, we affirm the award of punitive damages against

Doyle. 

D. The Amount of the Awards D. The Amount of the Awards
 

10 In addition, these factors further distinguish Matter of 
P & E Boat Rentals and Fuhrman. In the former case, as indicated 
earlier, the Fifth Circuit rejected vicarious liability in part
because the "corporation ha[d] formulated policies." 872 F.2d at
652. In the latter, the Sixth Circuit, upon considering the
unique emergency circumstances involved, concluded that the
captain had "the responsibility to make the final decision as to
what the proper course of action must be in view of all of the
factors concerned." 407 F.2d at 1147. Here, in contrast, Niles'
misconduct occurred during the regular course of operations, an
area where the owner could have and should have set policy.

-26-

Finally, we address defendants' arguments that the amounts

awarded in punitive damages were excessive and in error. The

court assessed punitive damages against Niles for $10,000 and

Doyle for $50,000.

We begin by stating two basic propositions. First, we

review the district court's determination of the correct amount

of punitive damages for clear error. See American Title Ins. Co. 

v. East West Financial, 16 F.3d 449, 461 (1st Cir. 1994). 

Second, punitive damages are solely intended to serve the

purposes of punishment and deterrence, and should not provide

plaintiff with a windfall. Aldrich v. Thomson McKinnon Sec., 

Inc., 756 F.2d 243, 249 (2d Cir. 1985); Ramsey v. American Air 

Filter Co., 772 F.2d 1303, 1314 (7th Cir. 1985). Taken together, 

we will not disturb an award of punitive damages unless we are

certain that it is greater than reasonably necessary to punish

and deter. See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 

21-22 (1991); Vasbinder v. Scott, 976 F.2d 118, 121 (2nd Cir. 

1992) (quoting Haslip, 499 U.S. at 21) ("Thus, the function of 

appellate review of punitive damages is to make 'certain that the

punitive damages are reasonable in their amount and rational in

light of their purpose to punish what has occurred and to deter

its repetition.'").

The Supreme Court has rejected a "mathematical bright line"

approach to the award of punitive damages. Haslip, 499 U.S. at 

18; TXO Production Corp. v. Alliance Resources Corp., 113 S. Ct. 

2711, 2721 (1993) (rejecting "an approach that concentrates

-27-

entirely on the relationship between actual and punitive

damages"). Instead, the Court has indicated that an award should

be reasonable in light of various considerations, such as the

magnitude of harm caused or potentially caused and the net worth

of the defendant. See TXO, 113 S.Ct. at 2722 & n.28. Contrary 

to defendants' exhortations, there is no general rule defining

the maximum proportion of net worth that may be exacted.

However, an award should not result in the defendant's financial

ruin. Vasbinder, 976 F.2d at 121; Arceneaux v. Merrill Lynch, 

Pierce, F. & S., 767 F.2d 1498, 1503 (11th Cir. 1985).  

Having set forth these basic considerations, we address each

award in turn. The assessment of $10,000 against Niles

constitutes approximately 55% of his net worth of $18,250.

Undoubtedly, this award will cause financial hardship.

Nonetheless, we are satisfied that the district court carefully

considered Niles' financial status when fashioning this

punishment. We cannot hold as a matter of law that the award

exceeds an amount appropriate for punishment and deterrence,

particularly in light of Niles' willful misconduct in destroying

CEH's property and in attempting to conceal that misconduct.

Therefore, we affirm the amount of Niles' award. 

In light of Doyle's higher net worth, the court awarded

punitive damages against him in the amount of $50,000. Doyle

argues that it is "fundamentally unjust" to punish a principal

who did not commit the misconduct at a higher level than the

actual perpetrator. Notwithstanding the difference in amount, we

-28-

note that, in terms of net worth, Doyle's punishment is

proportionately much less than Niles'. Moreover, it is axiomatic

that any theory of vicarious liability will inevitably involve

charging liability upon a less directly involved principal.

Additionally, the consideration of Doyle's net worth is integral

to the objectives of punitive damages: it ensures that the award

is neither too severe nor too trivial.

We cannot, therefore, conclude as a matter of law that a

$50,000 award here is clearly erroneous. We affirm the award

imposed against Doyle. 

Affirmed. Affirmed. 

-29-