Karen H. VALENTINE, Personal Representative of the Estate of James A. Valentine, deceased, for herself and for the benefit of Christine Valentine, a minor, John P. Valentine and Gloria Valentine, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 84–2596–Civ.

United States District Court, S.D. Florida, Miami Division.

March 20, 1986.

Howard Barwick, Barwick & Dillian, James A. Dillian, Miami Shores, Fla., for plaintiffs.

Debra Kossow, U.S. Dept. of Justice, Washington, D.C., for defendant; Walter Andrew Welch, of counsel.

## MEMORANDUM OPINION

## FINAL JUDGMENT WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPELLMAN, District Judge.

Karen Valentine, the duly appointed Personal Representative of the Estate of James Arthur Valentine, brought this action against the United States of America on behalf of the deceased's survivors and heirs. The airplane which Mrs. Valentine's husband was piloting disappeared on November 5, 1982. He and two passengers are presumed dead.

The plaintiff alleged that the employees or agents of the government were negligent in erroneously communicating to Nassau Flight Service that James Valentine's ("Valentine") aircraft was at Fort Lauderdale when in fact it was not. This miscommunication, plaintiff alleged, was the proximate cause of the twenty four (24) hour hiatus between the time the aircraft was declared overdue and the time the Coast Guard began its search. This delay was in turn the proximate cause of Valentine's demise.

The government did not contest the fact that its employees or agents did make the erroneous communication. The only issue that remained to be tried was whether the actions of the government were the proximate cause of Valentine's demise.

A five and one-half day trial concluded on February 28, 1986. The following comprises the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

James Valentine held private and commercial pilot's licenses for both multi- and single-engine land airplanes. He was not instrument flight rated, meaning he was not certified to fly an aircraft using an instrument flight plan ("IFR") rather than a visual flight plan ("VFR").

Valentine lived with his wife, Karen, their infant daughter, Christina, and his parents at the Valentine Yacht Club on Harbour Island in the Bahamas. At the Club, Valentine had various responsibilities. For example, he ran the dive shop, installed a computer system for the Club, oversaw the general maintenance of the grounds, and was a basic handyman.

Because of his involvement in the family run business, Valentine often had to go the United States for supplies. He used a 1966 Beechcraft Queen Air 65–B80 multi-engine aircraft. The plane's registration number was N1HQ, also referred to as N1–Hotel Quebec. The plane was equipped with weather radar and an emergency locator transmitter ("ELT"). An ELT is a device which goes off if it is subject to an impact three times the force of gravity (3G). Once the ELT goes off, it acts as a beacon for search parties. Other safety equipment on board included six yellow life vests, a yellow eight person life-raft, and pyrotechnics such as flares.

In late October, 1982, Valentine had Mr. Jim Hill of South Florida Aircraft in Fort

Lauderdale try to sell the aircraft. Mr. Hill performed the repairs and maintenance on the plane. No sale was ever made. On November 4, 1982, Valentine attempted to fly the N1HQ to Tampa before returning to Harbour Island. Brian Lupenske, an IFR pilot and flight instructor, was to accompany Valentine on this trip. When the men started the plane up, one of the engines caught fire. This was repaired, and they tried again. On the next effort, one propeller had some trouble and one of the four radios on board quit. Again the plane was fixed.

On November 5, 1982, Valentine and Lupenske took the plane up for several "touch and goes" to make sure it had been properly repaired. Everything seemingly in order, Valentine telephoned Pre-Flight Services in Miami for a full update of the weather in Fort Lauderdale. At approximately 1500 [1] local time, Pre-Flight Services told Valentine the ceiling over the area was 1500' broken and 4000' overcast with a visibility of six miles in haze. He was also told that Fort Lauderdale reported 1500' scattered variable broken formations, 3000' broken with an occasional visibility of five miles through light rain for the next couple of hours. Valentine made further inquiries as to off shore thunderstorms that might show up on radar. Pre-Flight Services advised him that there was a solid area of precipitation extending from Grand Bahama Island into the Fort Lauderdale/Miami area. This area covered almost all of Florida Bay and out beyond Bimini to the east. There were a few embedded thunderstorms in that precipitation, too.

At 1543, Valentine contacted Miami Flight Services ("FSS") to file an international instrument flight plan. The flight plan indicated that North Eleuthera was his destination, and that he intended to depart Fort Lauderdale at 1600. He also informed FSS that he was the pilot, the plane had five hours of fuel and the flight would take seventy minutes.

When Valentine filed the flight plan, he was advised that there was a broad area of solid precipitation with heavy rainshowers and embedded thunderstorms in the area between Florida and about thirty miles east of Bimini. There was also a SIGMET (significant meteorological condition) weather advisory in effect which showed an area of thunderstorms extending to a point one-hundred miles east of Miami. The embedded thunderstorms had tops of 44,000' and were moving in a northeasterly direction at a maximum speed of fifteen knots.[2]

FFS also informed Valentine that at 1500, Nassau weather service reported 1500' scattered clouds, 8,000' broken ceiling, overcast with visibility over six miles. There was also towering cumulus scattered over the area.

Despite these reports of severely inclement weather, Valentine departed Fort Lauderdale airport at 1626 with Brian Lupenske and Lupenske's girlfriend, Norma Peddle. Their destination was North Eleuthera.

At 1644, a manual controller at Miami Air Route Traffic Control Center contacted the Nassau Control Center and reported that it was estimated that the N1HQ would be positioned over Bimini at 1655 and at Mamel at 1744. Mamel is located in the Northeast Providence Channel, north of the airport at North Eleuthera.

Valentine was informed by Miami Center that with an estimated time of arrival ("ETA") of after 1744, he would be unable to land at North Eleuthera because the airport would be closed. The airport there was scheduled to close at 1727, the official sunset that day.

Valentine responded by telling Miami Center that he would "just speed it up a little". He then gave an ETA at Mamel of five minutes before official sunset. That was rejected by Miami Center which told

---

1. All times are local times on a military clock. The record contains an alternative time-table, referred to as Greenwich Mean Time or Zulu Time. These two appellations refer to a time clock that is five hours later than Eastern Standard Time.

2. One nautical mile, or "knot", is equivalent to 1.15 land miles.

him to apply that ETA to North Eleuthera. Valentine then estimated landing at North Eleuthera at 1725.

When Miami Center heard the new ETA, the controller expressed concern over how Valentine thought he could cut so much time off his previous estimate.

At 1654, Miami Center instructed Valentine to contact Nassau Radio at frequency 124.2. Valentine's last words were, "Okay, one twenty four two cleared to Mamel, ah, at five thousand and we'll see you later. One Hotel Quebec." At 1654, communication between Miami Center and N1HQ terminated.

It is unknown if Nassau Radio did in fact establish communication with N1HQ.

N1HQ was last seen on radar at 1703 about thirty miles east of Bimini. Beyond that point, radar in Miami cannot detect aircraft flying lower than 5000'. Nassau does not have radar capability.

N1HQ never closed its flight plan.[3] There being no communication by N1HQ with Nassau, Nassau radio contacted Miami FSS at 1804 to inquire whether N1HQ returned to Fort Lauderdale. At 1809, Miami FSS erroneously informed Nassau that N1HQ was on the ground at Fort Lauderdale.

Had Nassau Radio been told by Miami FSS that N1HQ was not at Fort Lauderdale, it would have notified the United States Coast Guard Rescue Coordination Center ("RCC"). Although N1HQ's ETA was 1725, it would be unreasonable to infer that it could have landed at North Eleuthera at 1725 since it was not scheduled to arrive at Mamel until 1744, according to Valentine's original estimate.

Colonel Jack Valentine, ("Col. Valentine"), Valentine's father, called Nassau Flight Services ("NFS") at about 1900 to report Valentine missing. NFS informed Col. Valentine that they were told Jim was on the ground at Fort Lauderdale. Col. Valentine tried to call Jim at Lupenske's apartment several times that night, but Lupenske's answering service was on. After Col. Valentine called the next morning on November 6, 1982, and there was still no answer, he called Mr. Hill at South Florida Aircraft. Mr. Hill told Col. Valentine that Jim had not returned to Fort Lauderdale. Mr. Hill then contacted the Federal Aviation Administration ("FAA") who contacted the Coast Guard at 1400 on November 6, 1982. It is inferred from a careful review of the telephone logs that the Coast Guard conducted three ramp checks a few hours later, all with negative results.

At about 1900 on November 6, 1982, the RCC launched its first aircraft search for the N1HQ. This search continued intermittently from that time until November 11, 1982 without success. Bad weather hampered the search and rescue efforts the first day or so. No trace of the plane or its occupants was ever found.

Information continued to be gathered by the RCC after the initial search. One of the search planes spotted two yellow objects in the water. A commercial vessel was diverted to retrieve the items. They were identified as plastic garbage bags.

Even after the actual search had terminated, the RCC continued to gather and record information. On November 13, 1982, Steven Wrinkle called the RCC. He told them that on November 5, 1982, he was flying from Nassau to Opa Locka to Bimini on a VFR. A frontal line was right over the gulfstream. To the east and west, the weather was fairly clear, but along the north south line it was terrible. Wrinkle radioed Miami to ask how best to circumvent the bad weather. Miami FSS instructed him to drop his altitude to 4,500 feet, and head south, flying around the bad spots. When trying to contact Miami FSS, Wrinkle heard another plane's transmission. The call numbers were something like 1HQuebec or 1HKuijo. The pilot stated that he was east of Bimini, closing out his flight plan, and going on to Georgetown. When Wrinkle heard the next day

---

**3.** A pilot "closes the flight plan" once the destination is in sight and the descent begins. This could be as far away as ten miles from the airport itself.

that Valentine was missing, he told Col. Valentine what he had heard. Wrinkle called the Coast Guard November 13th at 2100 and relayed his information to them. The telephone log of that day indicated, however, that Wrinkle had just spoken with Col. Valentine. It is unclear then exactly when Wrinkle actually gave the information to Col. Valentine.

On November 16, 1982, at 1020, Col. Valentine requested the Coast Guard to talk with George Thompson, Jr. Thompson claimed to have heard a radio transmission on his portable Panasonic radio which he identified as coming from Valentine. Thompson was in Nassau at the time, and said he had his radio tuned to a station that could pick up 124.0 or 124.2, the frequency Valentine would be using.

Thompson, a friend of the Valentine family, said he heard the following transmission on his radio: "air ambulance; on fire off Andros Island; going to crash." The speaker sounded panicky and like he was crying. The exact time when Thompson heard this was uncertain. Thompson said it was not light, it was not dark; the sun had not gone down. As the crow flies, the northern tip of Andros Island is midway between Bimini and North Eleuthera. Nassau is between Andros Island and Eleuthera island.

A few hours after Thompson heard this transmission, he tried to call Col. Valentine, but failed to reach him. Thompson saw Ed Latrope, a pilot, on November 6, 1982 and told him what he had heard. Other than that, Thompson never spoke with anyone about the incident. Word got to Col. Valentine about Thompson's experience, and Col. Valentine called the Coast Guard on November 16, 1982, and asked them to contact Thompson. Thompson was called by the Coast Guard, but he never returned the call.

George Thompson's testimony was not credible or informative. Had he heard a friend of his crashing to his death in a fiery plane, the Court believes he would have mentioned this event to someone besides a pilot with whom he spoke in passing. Also, the fact that this transmission was not picked up by anyone else indicates to the Court that Thompson lacked credibility.

Other than the two reports given by Wrinkle and Thompson, nothing is known about the fate of the N1HQ. The Court finds that their testimony was highly conclusory, vague and unreliable.

Several factors could have influenced the ultimate destiny of the N1HQ.

The weather on the evening of November 5, 1982 was not good. It is difficult to ascertain exactly what kind of weather the N1HQ went down in, because the aircraft's particular air route is unknown. Particularly in view of the fact that Valentine voiced his intention to reach North Eleuthera ahead of schedule somehow, it is difficult to determine what route the plane followed. All that is known is that the plane was last picked up on radar thirty miles east of Bimini. This position was not necessarily the point at which the plane was last airborne; this point signifies the outer reach of Miami's radar capability.

Depending upon where the N1HQ went down, it could have encountered seas anywhere from three to seven feet. If it had crashed in shallow water, it is likely that some debris would be have been found.

The Plaintiff's position on the probable fate of the N1HQ is untenable. Plaintiff proposed the following scenario as being that which more likely than not occurred. Valentine's plane went down due to an engine fire. He radioed for help while Lupenske took over the controls. Either his call numbers were not picked up, or in his distress, he called out "air ambulance" as the identifying name for the N1HQ. This transmission was picked up by George Thompson, Jr. The plane was going down quickly. Nevertheless, Valentine and Lupenske made a smooth ditch in three foot seas somewhere along his assumed air path. As soon as the plane hit, the three occupants, who suffered little or no injuries, removed the life raft from the plane, put it in the water, and inflated it. They then got into the raft, and the plane sunk.

The Coast Guard launched its search approximately twenty-four hours after the plane went down. By that time, the occupants had either drowned from fatigue, exposure or succumbed to the dangers of the shark infested waters.

The Court finds that with such a myriad of variables present, any attempt to determine what actually happened is speculation at best. Looking at the varying testimony regarding factors such as the weather, sea conditions, shark infestation, possible injuries, time constraints, damage to the safety equipment, the possibility of a submerged crash, and a host of other possibilities, it is simply impossible for the Court to find that the government's erroneous communication to Nassau Flight Service was even a contributing factor in the ultimate fate of James Valentine, much less the proximate cause of his demise.

There was credible testimony by Captain Rudy Peschel of the 7th Coast Guard District that even if the Coast Guard had been notified earlier, it would not necessarily have initiated a search and rescue mission before it did.

Before such an effort is launched, the Coast Guard analyzes the information it receives regarding the missing aircraft, such as the length of time it has been overdue, or whether there were any corroborating reports of the plane's distress. The Coast Guard also conducts ramp checks at the surrounding airports to verify that the plane did not land somewhere other than its designated airport. Ramp checks are seldom done at night because the smaller airports close after sunset.

In essence, not every plane that is reported overdue is searched for by the Coast Guard. Back in 1982, the Coast Guard did not have infrared goggles. The only meaningful search that could be conducted at night would be limited to keeping a lookout for fires or pyrotechnics. The Coast Guard would also watch for a signal from the plane's ELT. If the plane had a smooth ditching, it is possible that there would be insufficient force to activate the ELT. Or, if the plane crashed and was immediately submerged, the ELT would not go on because the device does not work under water.

Without some secondary information vis-a-vis an independent report, an ELT signal, a visual sighting, or some other indication that a search and rescue mission was called for, the Coast Guard probably would not have launched a mission any earlier than it did.

Much was made of the fact that the Coast Guard spotted two yellow objects in the water. A commercial vessel was diverted to investigate. The objects were later identified as plastic garbage bags. There was nothing heard at trial to suggest that the yellow objects were anything but garbage bags. Nor was there anything to suggest that the Coast Guard was remiss in its duties for failing to locate any debris from the plane.

Based on the record as a whole, live testimony and the exhibits entered into evidence at trial, it is clear that the FAA's erroneous communication to Nassau Flight Service was not the proximate cause of James Valentine's demise. In fact, virtually everthing that occurred after the N1HQ was last picked up on radar just thirty miles east of Bimini is speculation.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the United States pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741–52.

Venue is proper in the Southern District of Florida because the estate of James Valentine was opened in Dade County and Karen Valentine is a Florida resident.

Jurisdiction of this Court is further predicated on the Death on the High Seas Act, 46 U.S.C. § 761–68. This Act applies to deaths that occur more than three miles from shore.

 Assuming that Valentine's plane went down in navigable waters, general federal maritime law, rather than the law of Florida, is applicable in this action. *Pope and Talbot, Inc. v. Hawn*, 346 U.S.

406, 409, 74 S.Ct. 202, 204–05, 98 L.Ed. 143 (1953).

The burden of proof in admiralty cases is on the Plaintiff to show that the Defendant was negligent and that such negligence was the proximate cause of Plaintiff's damages. *See Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422, 427 (5th Cir.1977), *rev'd on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).

The Plaintiff must show that the government employee had a duty to her which was breached, and that breach was the proximate cause of the actual loss or damage suffered by Plaintiff. *Bridgford v. United States*, 550 F.2d 978, 981 (4th Cir. 1977).

The Plaintiff's burden requires her to show by a preponderance of the evidence that the Defendant's act was the cause of the injury. It must be more likely than not that Defendant's act was a substantial factor in bringing about the injury. *Heyman v. United States*, 506 F.Supp. 1145, 1150 (S.D.Fla.1981).

A finding of proximate cause may not be based on speculation or conjecture. *Jastremski v. United States*, 737 F.2d 666, 671 (7th Cir.1984).

In this case, the Plaintiff has failed to meet her burden and has not shown that the government's actions contributed to or constituted the proximate cause of James Valentine's demise. There being no indication that the United States of America is liable to the Plaintiff for negligence or in any other fashion, the action against the United States must be dismissed. Therefore, it is the conclusion of this Court that judgment must be entered in favor of the government.

Accordingly, the government shall within ten days from the date of this Order submit a Final Judgment in accordance with the foregoing Findings of Fact and Conclusions of Law, each party to bear its own costs.