IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PETER (PHUC) PHAN and QUYNH-GIAO THY NGUYEN, Husband and Wife,<br><br>          Appellants,<br><br>v.<br><br>PULLEN TOWS AND MARINE SALVAGE, LLC; JEFFREY PULLEN AND JANE DOE PULLEN AND THE MARITAL COMMUNITY COMPOSED THEREOF; BOAT/US INC.; AND DOES 1 THROUGH 5,<br><br>          Respondents. | No. 83252-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Once again, we are asked to reflect on the fate of Peter (Phuc) Phan's 57-foot catamaran. In an unpublished opinion, we previously upheld a finding that the City of Kirkland properly took permanent custody of the derelict vessel after it was dislodged from its grounding in Juanita Bay, and re-grounded near a Kirkland city pier, after it took on water while being towed.[1] Phan next sued BoatUS, a membership association for boaters that ordered the

---

[1] Phan v. Pollution Control Hearings Bd., No. 79392-6-I (Wash. Ct. App. March 20, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/793926.pdf.

Citations and pincites are based on the Westlaw online version of the cited material

tow, the towing company, and its owner for negligence, breach of contract, and negligent infliction of emotional distress.[2]  Phan appeals the summary judgment dismissal of all his claims.  Because there is no genuine issue of material fact, we affirm.

FACTS

Many background facts can be found in our unpublished opinion from Phan's first appeal that we need not repeat here.  See Phan, No. 79392-6-I, slip op. at 2.  Instead, we focus on facts relevant to the issues in this appeal.[3]  In October 2017, Phan did not have a slip to store his 57-foot catamaran and kept his vessel in the waters of Lake Washington with an anchor inadequate to keep the boat in place.  As a result, Phan grounded the boat several times in Juanita Bay.  The King County Sheriff's Office Marine Rescue Dive Unit received numerous reports of these groundings throughout September 2017.

On October 2, the Sheriff's Office again received a report of Phan's boat running aground in Juanita Bay.  Phan assured the Sheriff's Office that he was attempting to move the boat using its own engines.  Four days later, on October 6, the vessel was still aground.  Phan contacted BoatUS, a boaters' group that provides vessel towing assistance to members who purchase a towing service agreement.  This service operates similarly to the American Automobile

---

[2] Phan also claimed outrage, but the dismissal of that claim is not before us.

[3] Much of the factual record is taken from the Pollution Control Hearings Board findings of fact and conclusions of law entered January 26, 2018 and submitted by the defendants to the trial court in support of their motion for summary judgment.  The defendants gave notice to Phan of their intent to submit the motion under ER 904.  Phan did not object.  In a civil case, under ER 904, documentary evidence will be admitted absent an objection.  Miller v. Arctic Alaska Fisheries Corp., 133 Wn. 2d 250, 260, 944 P.2d 1005, 1010 (1997).

Association's (AAA) roadside assistance services, contracting with marine towing companies to provide services to members. BoatUS dispatched Pullen Tows and Marine Salvage, owned and operated by Jeffrey Pullen (Pullen), to assist Phan with towing his grounded vessel. This was at least the third time Pullen was dispatched to unground the vessel in Juanita Bay in the summer and fall of 2017.

Pullen possesses a 100-ton Master's License with a towing endorsement issued by the United States Coast Guard. He has operated Pullen Tows for more than 25 years and provides towing and ungrounding services to recreational boaters under a license and service agreement with BoatUS.

On October 6, Pullen and his assistant, Mike Cook, arrived to Phan's vessel in Juanita Bay, finding the boat approximately 20 to 40 feet from the shore, in "very shallow water." Although it had been windy the previous day, the wind subsided by the time Pullen and Cook arrived. Pullen had ungrounded boats in substantially worse weather.

Pullen described the lakebed in Juanita Bay as silty from runoff from Juanita Creek. According to Pullen, there are no rocks or submerged logs in the area. The water was too shallow for Pullen to bring his own vessel near Phan's, so Cook reached the vessel on a skiff to attach a tow line. Upon approach, Cook observed the bilge pumps "obviously working" and claimed Phan did not inform him of any concerns. Phan described the conversation differently:

> When we first met, I tried to approach and bring up my concern that although my boat is heading toward the deep water, but since my boat is drifted so close to the side of the beach where it is so near private residents and private docks, on front of my boat is

3

> actually shallower than its side or even its stern for some reason. I jumped down to the water to help it in the past few days, I knew the dept [sic] of the water well. Unfortunately, the assistant cut me off that, "you do not have to tell us how to do our job." I was little embarrassed and explaining that, "well, I only share what I've experienced about the area."

Cook tied a tow line to the vessel and verbally confirmed the tow plan with Phan. Cook asked Phan to engage his outboard engine once the boat became dislodged. Cook radioed to Pullen and told him Cook had confirmed the plan with Phan. When Pullen received word, he revved his engine to 1000 RPM, just long enough to allow the catamaran to become dislodged from the lakebed and drift on its own momentum. Phan described feeling the boat shake "horribly" when it started moving "fast." He "felt that the bottom or its propellers or sow [sic] were definitely dragged." Phan called and screamed at Cook asking if they could slow down "a bit." Cook screamed back that Phan should just help with the outboard engine. Phan described Cook as disregarding his fear or concern. Phan went to help with the outboard and when the boat was already out in the deep water, he went back down to check on the hull. Phan found at least one compartment had a "horrible water leak" with "a lot of water coming in." Phan went back up and screamed at Cook that his boat was sinking and that it was taking in a lot of water in one compartment.

About one minute after the vessel was dislodged, Cook observed that Phan's vessel began to sit lower in the water, indicating that the boat was taking on water faster than the bilge pumps could remove. Cook informed Pullen. Pullen decided it was not safe to tow the vessel in that condition and decided to re-ground it not far from where he had found it, about 70 feet from the Juanita

4

Beach Park public pier. Because Pullen had been dispatched for an ungrounding operation, he did not use his salvage boat. He and Cook told Phan that they would have to return to their dock to retrieve Pullen's salvage boat with dewatering equipment. However, as Pullen headed back to his dock, he confirmed by phone with Phan that salvage and dewatering was not covered under Phan's BoatUS plan. When Pullen asked if Phan had insurance coverage for salvage work, Phan told Pullen he would "get back to [him]" but never contacted him again. Pullen did not provide any additional service.

Phan then contacted the King County Sheriff Office, which was concerned that the vessel would capsize. Deputies assisted in dewatering the vessel to prevent capsizing, and Phan eventually hired a commercial service, Aqua Dive Service (Aqua Dive), to get the vessel afloat again. Aqua Dive plugged the leak in the hull and dewatered the vessel so it could float. However, weather continued to deteriorate with three-foot waves and 10-20 mile per hour winds that continued to push the vessel against the pier. Aqua Dive told Phan it could no longer take the vessel because of the worsening weather and safety concerns. The next day, the wind and waves pushed Phan's boat into the pier causing further damage to the vessel and the pier. The vessel sank, resting on the lakebed in approximately two and a half feet of water. A surveyor found the vessel had sustained significant damage and was a "total loss due to the structural stern damage and from the flooding."

Unable to comply with the sheriff's order to immediately remove the vessel, the City of Kirkland impounded the vessel and eventually took custody of

the vessel under the Derelict Vessels Act. Phan initially appealed to the Pollution Control Hearings Board and eventually appealed the Board's decision to us. We issued our decision in an unpublished opinion on March 2, 2020, which reversed the Board's finding that the city properly took temporary possession of the vessel but affirmed the finding that the city properly took permanent custody of the vessel on November 17, 2017. Phan, No. 79392-6-I, slip op. at 20.

In October 2020, Phan and his wife[4] filed suit against BoatUS, Pullen individually and Pullen Tows and Marine Salvage, LLC,[5] Phan claimed negligence, breach of contract, negligent infliction of emotional distress, outrage, and special damages stemming from the tow of the vessel on October 6, 2017. The defendants filed a joint motion for summary judgment on all claims. The trial court granted the defendants' motion. Phan appeals, challenging the dismissal of all claims except the claim of outrage.

DISCUSSION

Standard of Review

We review summary judgments de novo. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). Summary judgment is appropriate when "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Rangers Ins. Co. v. Pierce County, 164 Wn.2d

---

[4] Other than including his wife's name, Quynh-Giao Thy Nguyen, as a plaintiff in the amended complaint, the record shows no involvement by her. Phan's declaration indicated that he owned the vessel.

[5] Phan also included "Jane Doe Pullen" and Does 1 through 5 as defendants. Pullen maintains in his brief that he is unmarried.

545, 522, 192 P.3d 886 (2008)); CR 56(c). We must construe all facts and inferences in favor of the nonmoving party. Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

Negligence

The parties agree that federal maritime law governs this action. The elements of a maritime negligence cause of action are essentially the same as those for a "land-based" negligence action under common law: (1) the existence of a duty that requires a standard of care or conduct to protect against foreseeable risks, (2) a breach of that duty by conduct that falls below a reasonable norm, and (3) a reasonably close causal connection between the breach of duty and the resulting loss. Alprin v. City of Tacoma, 139 Wn. App. 166, 171, 159 P.3d 448 (2007) (citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630-32, 79 S. Ct. 406, 3 L. Ed. 2d 550 (1959)). The plaintiff must prove each element by a preponderance of the evidence. Id. (citing Valentine v. United States, 630 F. Supp. 1126, 1132 (S.D. Fla. 1986); See also Mid-America Transp. Co., Inc. v. Nat'l Marine Serv., Inc., 497 F.2d 776 (8th Cir. 1974) (holding that the burden of proving negligence of a tug or tow is on the party asserting it).

Towage is the use of one vessel's power to tow or draw another. Stevens v. The White City, 285 U.S. 195, 200, 52 S. Ct. 347, 76 L. Ed. 699 (1932). The

towing vessel has a duty to "exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Id. at 202. There is no presumption of negligence where a boat was "in good order when received" by the towing vessel and "in damaged condition" after the towage. Id.

Phan contends with no supporting expert testimony that Pullen breached his duty by not inspecting the vessel before towing. A tug operator generally has no duty to perform a detailed inspection of the towed vessel before towing. Mid-America Transp. Co. v. Gladders Towing Co., 492 F. Supp. 475, 478 (E.D. Mo. July 3, 1980) (citing Massman Const. Co. v. Sioux City & New Orleans Barge Lines, Inc., 462 F. Supp. 1362 (W.D. Mo. Jan. 9, 1979)). A duty to inspect may arise in the event of inclement weather conditions or special circumstances the towing vessel is aware of. Consol. Grain and Barge Co. v. Flowers Transp. Inc., 538 F. Supp. 65 (E.D. Mo. March 31, 1982). The weather that made it unsafe to move the vessel in the instant case did not occur until after the vessel had been regrounded near the public pier. Heavy winds blew the day before the tow but had subsided by the afternoon on the day of the tow. After the tow, Aqua Dive plugged the leak, dewatered the vessel, and got it to float. However, Aqua Dive told Phan it could not take the vessel because the weather worsened causing safety concerns. The winds in fact pushed the vessel into the pier causing damage to the pier and the vessel. The vessel sank the next day. To the extent Phan contends it was negligent for Pullen to not have taken into account where he "placed" the vessel and the "windy conditions," Phan presented no evidence, other than his own conclusions, that Pullen breached a standard of care by

8

regrounding the sinking vessel near the pier in existing weather conditions despite offering to return with his salvage boat.

Towed vessels impliedly warrant that they are seaworthy.  Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S. Ct. 156, 86 L. Ed. 89 (1941).  If the unseaworthiness of a towed vessel is discovered, the tug operator must take reasonable steps to save the towed vessel.  McDonough Marine Serv., Inc. v. M/V Royal St., 465 F. Supp. 928, 935 (E.D. La. 1979), aff'd 608 F.2d 203 (5th Cir. 1979).

Phan yelling to ask that Pullen slow the tow does not establish that it was evident to Cook or Pullen that anything was wrong other than the grounding, which Pullen serviced before.  It was not until Phan saw the water leak that he yelled that the vessel was sinking.  However, even viewing the evidence in the light most favorable to Phan, he and Cook noticed about the same time that the vessel was taking on water.  This was relayed to Pullen who immediately determined the unsafe conditions and regrounded the vessel.

Phan appears to suggest that if Pullen had slowed the tow, it would have either prevented the leak or at least slowed the leak.  However, this is mere speculation and, even if true, does not establish that the speed at which Pullen initiated the tow violated a standard of care for the circumstances.[6]

---

[6] Phan argues for the first time in his reply brief that he should be considered an expert.  Not only was this not argued below, Phan did not present evidence to qualify as an expert.  "An issue raised and argued for the first time in a reply brief is too late to warrant consideration."  Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

The undisputed evidence establishes that Pullen, who possessed 25 years of towing and ungrounding experience, identified "nothing unusual" about the tow on October 6, prior to Phan's vessel taking on water. There was no extreme wind or weather at the time Pullen and Cook arrived, the bilge pumps on Phan's vessel were operating. Pullen was familiar with the vessel and the area having successfully ungrounded it from Juanita Bay at least twice before. Pullen knew the bay to be silty because of the run off from Juanita Creek and knew there was no concern for rocks or submerged logs in that area. Only after Pullen dislodged the vessel, so that it was moving with its own momentum, did Cook observe the vessel sitting lower in the water, suggesting it was taking in water more than the bilge pumps could handle. It was at this point that Pullen determined the towing was not safe and decided to reground the vessel. Pullen offered to return with his salvage boat and dewatering equipment, but Phan did not sign up for that service under BoatUS and did not otherwise follow-up with Pullen's offer.

Phan has failed to establish any genuine issue of material fact as to whether Pullen breached a duty to Phan to support a negligence claim.

Breach of Contract

Phan spends more time describing the contractual relationship between Pullen and BoatUS than establishing how a contract was allegedly breached. Instead, it appears that Phan's breach of contract claim is also based on his failed negligence claim. Phan contends "Boat[US] should be held liable as that

Pullen Tows should be considered a subcontractor or agent of Boat[US] and as such is liable for the *negligent* performance of Pullen Tows." (Emphasis added.)

Phan spends one paragraph of his brief claiming that defendants breached an "implied warranty of workmanlike service to perform its towing services properly and sagely, once having undertaken the responsibility." Not only does Phan fail to cite any supporting authority, this theory also rests on nothing more than a conclusory statement that the defendants failed "to perform its towing services properly and safely, and as a direct and proximate result, the Plaintiff's sustained damages." Argument unsupported by a citation to authority will not be considered. Cowiche, 118 Wn.2d at 809; RAP 10.3(a)(6).

Because Phan does not establish a genuine issue of material fact as to an existence of a breach, we need not consider whether a contract existed between Phan and Pullen nor address whether any liability for negligence extends to BoatUS through its contract with Pullen.[7]

## Negligent Infliction of Emotional Distress

A tort is committed when a plaintiff subjected to emotional harm is within the "zone of danger" created by the defendant's negligent conduct. Stacy v. Rederiet Otto Danielsen, A.S., 609 F.3d 1033, 1035 (9th Cir. 2010) (citing Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 544, 114 S. Ct. 2396, 129 L. Ed 2d 427 (1994)). The "zone of danger" test allows for recovery for "those plaintiffs

---

[7] Phan alleges for the first time on appeal, without any supporting authority, that Pullen breached his duty by sending his assistant, who according to Phan is "not a licensed seaman," to Phan's boat on a skiff to secure the tow line. An appellate court "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005). We refuse to do so here.

who sustain a physical impact as a result of defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." Id. Gottshall has not defined when a plaintiff is in immediate risk of physical harm, but where a plaintiff has not suffered a "physical impact," the Second Circuit has held that "the risk of physical harm to the plaintiff must be, at the very least, more than minimal." Nelson v. Metro-North Commuter R.R., 235 F.3d 101, 113 (2d Cir. 2000).

To support his claim of negligent infliction of emotional distress, Phan simply claims he was "definitely in the zone of danger based upon the damage to his vessel and the vessel taking on water." A claim of negligent infliction of emotional distress necessarily requires negligent conduct on the part of the defendant. See Gottshall, 512 U.S. at 544. Here, Phan failed to present evidence showing a genuine issue of material fact precluding summary judgment regarding his negligence claims against all the defendants. As a result, his negligent infliction of emotional distress claim necessarily fails. Moreover, nothing in the record establishes that Phan was in immediate risk of physical harm when his vessel was in shallow water while he was on it during the tow.

The trial court did not err in granting the defendants' motion for summary judgment.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____         _____
Mann, J.